Bridges, Plaintiff in error, vs. The State, Defendant in error.*

*June 15—June 28, 1945.*

---

* Motion for rehearing denied, without costs, on September 11, 1945.

352

Joseph G. Hirschberg, Martin M. Morrissey, and Lucius A. Squire, all of Madison, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, *Norris E. Maloney,* district attorney of Dane county, and *John A. Lawton,* deputy district attorney, and oral argument by *Mr. Platz* and *Mr. Lawton.*

FRITZ, J. The defendant is thirty-three years of age and a corporal in the United States army. On February 26, 1945, and for some time before and after that date he was stationed at Truax Field as a permanent party, and he resided at 125 East Johnson street in the city of Madison. He is off duty on Mondays, and on the trial of this action he testified,—and

also a corroborating witness,—that he and his wife were at that home all day on Monday, February 26, 1945. Under evidence, which was largely uncontroverted on the trial,—but the truth of which is not admitted by defendant,—it was within the province of the jury to be satisfied beyond any reasonable doubt and to find that on February 26, 1945, between 4 and 5 p. m., a man wearing a soldier's uniform committed an assault, under circumstances which clearly constituted the taking of indecent liberties with the person of the complaining witness, Sharon Schunk, a seven-year-old girl (hereinafter referred to as "Sharon"). She testified that upon leaving school at about 3:30 p. m. on February 26, 1945, she walked westward toward her home about six blocks away at 721 West Washington avenue in the city of Madison. While en route, when she reached the corner of Washington avenue and Bedford street,—known to her as "Billy's Corner," —the soldier, who had been walking behind her, caught up to her and said "Let's go across," and took her by the hand. While walking with her several blocks the soldier said he had some funny books and wanted her to do something for him; and finally he had her enter a house and go into a second-floor room in which he then committed the assault. Defendant testified on the trial that he did not see or speak to or walk with Sharon, and denies that he is the man who committed the assault testified to by her. And in support of that denial he relies principally upon testimony by himself and Mrs. Kitty Blood that during the entire morning and afternoon of February 26, 1945, he and his wife, Peggy Bridges, were alone in the second-floor front room at 125 East Johnson street, which they used as their home and rented from Mrs. Blood, who owned and also resided in the house. In view of defendant's denials and his testimony, and Mrs. Blood's corroboration thereof, the crucial issue is whether there was otherwise competent evidence which, if considered credible by the jury, was sufficient to establish beyond any reasonable doubt that defendant was the man wearing a soldier's uni-

form, who committed the crime in question; and the identification of the defendant as that man depends, in turn, under the evidence herein, largely upon whether the house and room to which Sharon was taken by the man who assaulted her was the house and room at 125 East Johnson street in which defendant resided.

In relation to particularly those issues there was testimony on the trial to the following effect. Sharon testified, in addition to that stated above, that she and the man, whom she identified on the trial as the defendant, walked fifteen or sixteen blocks to the soldier's home. There they went up a wooden steps to a porch and entered the left one of two doors and went up a stairway and into the room. She had on her coat and snow pants, mittens and hat, and had her lunch bucket. Inside the room the man gave her a quarter which she put on a chair. She remembered (on the trial) that there were in the room a dresser, chest of drawers, bed, and by the latter a big shelf with some pictures and other little things like that on it, and also a chair with a clock and radio on it; that there was a table with a lamp on it and a lady's picture, which the soldier said was of his wife; and that there were two dolls, a boy and a girl, with cloth faces and there were two little windows and a big one. The soldier gave her some funny books and she looked at the covers. Then he committed the acts constituting the taking of indecent liberties with her person. After she put on her clothing she took the quarter and went outside, but forgot to take her lunch bucket until the soldier called to tell her and she went back for it. Upon leaving the house she turned to her left (westward) and went up the street three or four blocks to where there was a policeman (at West Johnson and State streets). She asked him whether this is where the Wingra Park bus comes. He said it was not and put her on another bus on which she went a little ways and then transferred to a Wingra Park bus to take to her home.

Sharon's mother, Mrs. La Vern Schunk, testified that Sharon arrived home at about five minutes to 5 on that afternoon, and while she was being questioned as to the lateness of her arrival and where she was so long she began to cry and gave each of her brothers a nickel, and said she got the money from a soldier and that she had gone to his house; and when asked where the house was she said she did not know, it was a long way. Mrs. Schunk on examining Sharon noticed what appeared to be semen on her panties, and upon further questioning her, she told the mother some of the particulars of the indecent liberties. Mrs. Schunk and her husband then went to the police station and Detective Nee and Police Matron Clark went to the Schunk residence to investigate the case. They took Sharon and Mrs. Schunk along in a police car to look for the soldier and the house where Sharon had been taken. While they were driving around Sharon mentioned having seen in the room where she had been taken a bed and a chest of drawers, a dresser, and table with a picture of a lady on it and a chair by the bed with a radio and alarm clock on it. And on cross-examination by defendant's counsel, Mrs. Schunk testified to the following effect. While riding in the police car looking for the house, Sharon described it as having wooden steps which were grey and had bricks on the side of the steps, and that as she got on top of the steps on a porch there were two doors going into the house; but Mrs. Schunk testified she could not recall whether there was anything said that the porch was inclosed.

Detective Nee testified that while riding in the police car on the night of February 26, 1945, they drove to the point near the corner of West Washington avenue and Bedford street, where Sharon said she started out with the soldier. From there as she directed the course of travel, they proceeded northward on Bedford to West Mifflin street and eastward on the right side. Sharon had given them a description of the house and Nee told her to say if she observed a house that looked like it. After proceeding (apparently about five blocks) without

Sharon pointing out any house, Nee turned around and retraced and stopped at a house in the first block in which there was only one house on the right-hand side which answered the description Sharon had given. Nee took Sharon into the house and up to the second floor to determine, if he could, if that was the place. When they got to the top of the stairs she shook her head and indicated it was not, and said there were a lot of toys and articles that children would play with on the top landing and those she said were not there in the house she had gone to with the soldier. That night she did not remember any objects in the vicinity of the house where she had been taken.

Detective Nee further testified that before the next afternoon, when he and Detective Fleming took Sharon and her mother with them again, they had learned that Sharon had traveled four blocks until she had met the police officer who had put her on the bus. So to place the position of the house they asked her some questions, and if she could tell them about where the house was located in the block. She said it was near the middle of the block, the third or fourth house from the corner. They asked her if there was anything in the neighborhood, anything distinguishing that she could remember about that neighborhood that might place this house and make it easier for them to find it. She said she remembered there was a little house like a playhouse or doll's house, she called it, setting back from the street, and that there was a white fence around it. They looked for a house of that nature, but did not find any at that time.

It appeared on the trial, without dispute, that upon the arrest of defendant in relation to another matter, he consented on March 27, 1945, to let the police enter his room at 125 East Johnson street; and Fleming testified that on that date he and Detective Milsted took Sharon and her mother in the police car and drove eastward past 125 East Johnson street and Sharon was told to notice the houses in that block. Fleming and also Mrs. Schunk testified Sharon was looking for the

house to which she had been taken by the soldier, but did not recognize any of the houses in the block; so they turned around at the end of the block and drove back and parked approximately across the street from 125 East Johnson street, and then Sharon said the house at that number looked like the house. Mrs. Schunk testified Sharon then pointed out the house at No. 125 as to the steps and sides, and said that the steps and the bricks on the side looked very much like the porch of the house she had been taken to by the soldier. Fleming and Mrs. Schunk testified that Sharon went with the detectives and her mother, and entered the left one of two entrance doors and up the stairway in that house, and entered the room (which was rented to defendant). When Sharon stepped inside that room she, according to Fleming's testimony, stood there for a second or two looking around the room and started nodding her head. And according to Mrs. Schunk's testimony Sharon then said that was the room, and then looked around at different things and said that this was the place; and she went over to the dolls and said those dolls weren't on that box then,—they were on the chest of drawers when she first saw them. Fleming likewise testified Sharon said that the dolls were not in the same place they had been before on a chest of drawers over on another wall of the room; that the alarm clock and radio "were there;" and that the picture of the lady on the table had been there.

The following are undisputed facts. The house at 125 East Johnson street, in which defendant resided, is a two-story brick house with stone trimmings. There are wooden steps leading up to the floor of a front porch and the steps are flanked at their sides with a series of brick piers. From the porch there are two separate entrances to the house, and the door on the left is the entrance to the stairway to the apartment rooms on the second floor. Across the street from that house there is an exceptionally attractive and distinctive small cottage with a white fence around it setting back somewhat from the street.

Furthermore, to establish the identity of the defendant as the man who committed the offense charged, the state relies upon proof to the following effect. Sharon testified on the trial,—

"*Q*. Did you see that man that took you to the room, did you see him here today? *A*. Yes.

"*Q*. Will you point him out to us? *A*. That guy (pointing).

"*Q*. Tell us where he is sitting? *A*. On the left, on the second—in the first row on the right side, on this side.

"*Q*. Is he sitting by a lady? *A*. Yes.

"*Q*. Is that the same man, are you sure, Sharon? *A*. Yes."

It is apparent from the record that the man thus pointed out by Sharon in the presence of the jury was the defendant. In addition there is proof that at a "show-up" at the police station on March 29, 1945, four soldiers and an M. P. sergeant in uniform were arranged in a single line, in which defendant was also placed, in a room facing a door in which there was glass through which they could be seen by a person on the other side, who could not be seen by them. Thereupon several girls, including Sharon and Geraldine Shipley,—none of whom had previously seen who the men in the line were,— were allowed separately to view the men through the glass door, without saying anything. On the trial Sharon testified:

"*Q*. Now, did you see him [the defendant] some time later, Sharon? *A*. Yes.

"*Q*. And when was that? *A*. That is when they were in a row in the one office.

"*Q*. They were in a row? Did you see this same man yourself sitting down in the front row in a soldier's uniform—was he there that day, too? *A*. Yes.

"*Q*. Weren't they all soldiers that day, Sharon? *A*. Yes.

"*Q*. In a row? *A*. Yes. . . .

"*Q*. How could you tell him from the other men, they all had soldier's uniforms? *A*. Yes, I could tell by his face.

"*Q*. You could tell by how he looked, is that how you seen him before? *A*. Yes.

"*Q.* You don't remember where he was standing in that line though, do you? *A.* Yes.

"*Q.* Do you think you can remember that, too? *A.* By the map in the middle of the thing.

"*Q.* He was standing by a map? *A.* Yes.

"*Q.* Where was the map? *A.* In the middle of the room.

"*Q.* Was the map hanging on a wall? *A.* Yes."

Likewise, Geraldine Shipley, a seven-year-old girl who in turn was allowed to view the line of soldiers at the "show-up," testified on the trial she saw the defendant and is sure that he was the man who walked and talked with her on February 26, 1945, under the following circumstances: As she was walking, after getting out of school at 3 p. m., eastward on West Washington avenue toward her home on that street a man came down the street toward her and turned around and asked her if she liked funny books, and she said yes. He said his cousin or sister was going to throw them away, and took hold of her wrist and they went up the street, and he said "Do you want a quawtah." He went with her across the street, and then a little further and down across the street again and then up the street. When she said she wanted to go home, he did not let her go until they got across the street. He gave her five pennies. She also testified she knew he was a soldier because he had on a uniform, including an overcoat. Upon being questioned in the court as to whether that soldier was around there, she answered "Yes" and pointed to him and stated he was "Right by that lady." Thereupon the district attorney then asked defendant's three attorneys, "Do counsel for the defendant agree that the witness is pointing to the defendant?" And the court likewise inquired, "Do any of the three attorneys agree to that?" Upon the failure of defendant's attorneys to answer these questions, the court said, "The court will state that the record shows the witness was pointing to the defendant." To that statement no objection was asserted by defendant's attorneys, and in view of their failure to do so the obvious inference is that defendant was the man pointed

out by Geraldine Shipley as the man who she testified walked and talked with her on West Washington avenue shortly after 3 p. m. on February 26, 1945.

In addition there is also the testimony of William Fahringer, a school guard at the crossing of West Washington avenue and Bedford street, that he knows and has seen Sharon Schunk every day she went to school; that between 3:30 and 4 p. m. on February 26, 1945, he saw her standing with a soldier at the south curb at the corner of West Washington avenue and Bedford street; that he did not get a good look at the soldier's face, but he said he wore a soldier's uniform and was about medium height and chunky rather than thin; and that Fahringer saw the soldier and Sharon as they went west across Bedford street and then north across West Washington avenue until just before they reached the curb.

The testimony stated above, taken into consideration with all of the other evidence, in so far as it can be deemed to have any bearing upon the issues as to the identity of the man who committed the assault, was sufficient, if considered credible by the jury, to warrant the jurors in being convinced beyond all reasonable doubt and therefore finding,—notwithstanding defendant's testimony that he never saw Sharon Schunk or Geraldine Shipley until he saw them in court,—that the assault was committed by him in the room in which he and his wife resided at 125 East Johnson street; and that he was guilty as found by the jury's verdict. Defendant contended and he and his corroborating witness, Mrs. Blood, from whom he rented the room at 125 East Johnson street, testified that he and his wife were in that room all of the afternoon of February 26, 1945. However, the credibility and truth of that testimony was so seriously impaired that the jury could disbelieve that testimony if the jury considered credible and believed evidence introduced by the state that defendant's wife had made and kept an appointment for service on that afternoon at a beauty parlor; and that she was there until about 4 o'clock.

This is one of those cases that always gives us great concern. Taking all of her testimony into consideration, it is evident that although the seven-year-old complaining witness, Sharon, is apparently somewhat brighter than the average child of her age, her testimony is subject to infirmities that testimony of such children generally is subject to. However, on close analysis and due consideration thereof in connection with many facts established undisputably by other evidence, Sharon's testimony does not appear to be so contradictory as to impair its credibility as a matter of law. The statements made by her to her mother and police officers,—prior to their discovery of the location of defendant's room,—as to the general appearance of the steps to the porch and the front entrance doors of the house to which she had been taken on February 26, 1945, were fairly accurate for a child of her age and limited schooling and vocabulary, and her first description of the room and articles therein was not too much out of line, although it was not distinctive enough to be of much value either way. She had an impression of the direction and distance she traveled, and that is not too much out of line. She was uncertain as to the precise location of the house, which is natural. But she placed it as near the middle of a block and in the vicinity of a little house like a playhouse, or doll's house she called it, setting back from the street, and that there was a white fence around it. These premises, which are in fact across the street from 125 East Johnson street are attractive and distinctive and would naturally stay in a child's memory. She positively identified the defendant at the police department "show-up" and again on the trial in the presence of the jury; as was also done by Geraldine Shipley, the other little girl accosted by defendant on West Washington avenue. Sharon's impression of the size of the defendant would appear to be natural enough unless she saw him in company with other soldiers of great height. Her testimony as to the offense is sufficiently definite and if believed the jury could find under the evidence herein that the offense charged was

committed by the defendant and that he was guilty as charged. *Parke v. State,* 204 Wis. 443, 235 N. W. 775. Consequently the court was warranted in sustaining the verdict, and the judgment entered thereon must be affirmed unless, as defendant contends, prejudicial error was committed by the court in admitting certain testimony over defendant's objections or in otherwise ruling adversely to defendant in the following respects.

Defendant contends the court erred in admitting testimony given by Sharon's mother as to statements made by Sharon in the absence of defendant. In his brief he does not specify the subject matter of those statements. There is a mere general reference to pages 14 to 17 of the transcript of the proceedings on the trial. On those pages there is testimony by Mrs. Schunk as to some statements which,—in answer to her questions,—were made by Sharon, upon returning home at 5 p. m. on February 26, 1945, in relation to the above-stated particulars as to the indecent liberties taken by defendant. The mother's testimony as to the statement of those particulars by Sharon was clearly admissible under the rule that where the person ravished is very young, testimony as to the particulars of such statements by her is admissible. *Hannon v. State,* 70 Wis. 448, 451, 452, 36 N. W. 1; *Bannen v. State,* 115 Wis. 317, 329, 91 N. W. 107, 91. N. W. 965; *Smits v. State,* 145 Wis. 601, 605, 606, 130 N. W. 525.

Defendant contends the court erred also in admitting testimony by police officers as to matters stated by Sharon in defendant's absence. He claims these statements were hearsay evidence and therefore were not admissible. In his brief defendant states in a general way that the officers were allowed to testify "that the little girl said this, the little girl said that," but neither in the brief,—nor by any citation therein to the three-hundred-page transcript,—is there specified what the particular testimony is which defendant claims was inadmissible. In the absence of any such specification we cannot very well pass upon defendant's contention in this respect. There

is testimony by police officers and also Mrs. Schunk as to statements which were made to them by Sharon on February 26 and 27, 1945, and also during the course of their subsequent investigations to ascertain the identity of the man who committed the offense and of the house and room in which it was committed. In those statements she spoke, as hereinbefore stated, of various matters and features which she remembered and which were descriptive of the exterior and surroundings of the house; and of the room and various articles and the location thereof therein. It is true that testimony as to such statements was hearsay and, as such, inadmissible if the purpose for which it was received had been to establish thereby that there were in fact the stated articles in the room, or that they were located as stated, or that the exterior features or surroundings of the house were as Sharon stated. That, however, was not in this case the purpose for which the evidence as to those statements was admitted. It was admissible in so far as the fact that she had made the statements can be deemed to tend to show that at the time those statements were made,—which was a month prior to the subsequent discovery of the room and house at 125 East Johnson street,—she had knowledge as to articles and descriptive features which, as was proven by other evidence, were in fact in or about that room and house. If in relation thereto Sharon made the statements as to which the officers and her mother testified, then those statements,—although they were extrajudicial utterances,—constituted at least circumstantial evidence that she then had such knowledge; and that such state of mind on her part was acquired by reason of her having been in that room and house prior to making the statements. Under these circumstances there are applicable to the hearsay testimony in question the following propositions stated in Wigmore, Evidence (3d ed.), to wit:

"The condition of a speaker's mind, as to knowledge, belief, rationality, emotion, or the like, may be evidenced by his

utterances, either used testimonially as assertions to be believed, or used circumstantially as affording indirect inferences. . . . The usual resort is to utterances which circumstantially indicate a specific state of mind causing them. To such a use, then the hearsay rule makes no opposition, because the utterance is not used for the sake of inducing belief in any assertion it may contain. The assertion, if in form there is one, is to be disregarded, and the indirect inference alone regarded. This discrimination, though well accepted in law, is easy to be ignored, and it needs perhaps to be emphasized." Vol. 6, p. 237, sec. 1790. See also p. 234, sec. 1788; p. 240, sec. 1791.

"When a person's knowledge or belief is a fact in issue, conduct and word-utterances may betray the knowledge or belief of the actor or speaker, in so far as the specific act or utterance is of a tenor which cannot well be supposed to have been willed without the inner existence of that knowledge or belief. . . . For such instances of conduct, including utterances, as evidence of knowledge or belief, there can be no general test of relevancy. Ordinary experience usually suffices, without controversy, to tell us whether the inference is at least a fairly possible one, and therefore whether the evidence is admissible. . . . It is to be noted that there is a specific hearsay exception for assertions as to declarant's mental condition; and thus an utterance of that particular sort—e. g., 'I know where the money is,' as distinguished from 'The money is hid in my house,'—is receivable equally by either of the two avenues, as circumstantial evidence and as a testimonial assertion. . . . " Vol. 2, p. 87, sec. 266.

Likewise in point are the following statements in 20 Am. Jur., Evidence, p. 404, sec. 457:

"The hearsay rule does not operate, even apart from its exceptions, to render inadmissible every statement repeated by a witness as made by another person. In some instances, the fact that a statement was made, rather than the facts asserted in the statement, is material. . . . There is no question that where a particular state of mind of a person is a relevant fact, declarations which indicate its existence are admissible as primary evidence, notwithstanding the declarant is available as a witness."

"Assuming that the state of mind of a person at a particular time is relevant, his declarations made at that time are admissible as proof on that issue, notwithstanding they were not made in the presence of the adverse party. It is clear that when evidence of the declarations of a person is introduced solely for the purpose of showing what the state of mind or intention of that person was at the time the declarations were made, the declarations are regarded as acts from which the state of mind or intention may be inferred in the same manner as from the appearance of the person, or his behavior, or his actions generally." (p. 491, sec. 585.) See also p. 312, secs. 335, 336.

So in this case the proof that Sharon made the statements in question before there was any possibility of having what she stated she remembered about the house, and room, and articles therein, from her first contact therewith, affected or changed by what she learned after the discovery and location thereof, at 125 East Johnson street, is material and significant in so far as it tended to show that she had knowledge of certain things in and about the house and room. The existence of those things in fact could not, however, be established by her hearsay statements, but had to be proven by other evidence which was competent. In other words, although proof of her extrajudicial assertions was competent to show such knowledge on her part, it could not be deemed to prove the facts asserted thereby. When, for instance, it was proven that Sharon stated during the evening after the alleged assault that there was a picture of the lady in the room, her statement did not constitute competent evidence to prove that there was such a picture in the room. But her statement was competent as evidence to prove that she had knowledge of such an object in the room and for this purpose the utterance is not inadmissible hearsay, but is a circumstantial fact indicating knowledge on the part of Sharon Schunk at a particular time.

Defendant claims that the court admitted testimony by police officers to the effect and import that Sharon and

Geraldine Shipley had identified the defendant at a police station "show-up" as the man who accosted each of them on West Washington avenue on February 26, 1945, and defendant contends that such testimony was hearsay and the admission thereof constituted prejudicial error under the rule stated in *O'Toole v. State,* 105 Wis. 18, 80 N. W. 915. Upon examining the portions of the transcript, cited by defendant, it does not appear that any of the officers testified as to any conversation with or statements made by either of the girls in connection with or in relation to what either observed at the "show-up;" nor did the officers testify that either of the girls then identified the defendant as the offender. Detective Milsted did testify that on March 28, 1945, defendant was among five other soldiers likewise in uniforms in a line-up for the "show-up" at the police station; that the soldiers were in a room where they could be seen through the glass in a door by a person on the other side; that neither of the girls had seen the soldiers or knew who they were before the girls were separately given an opportunity to view through the window all of the soldiers in the line-up, including the defendant. There is no testimony as to what either of the girls then observed, excepting that on the trial each of the girls testified she saw in the line-up the soldier who had accosted her on West Washington avenue. Consequently as each of the girls testified on the trial that she saw the defendant in the "show-up" and there was no testimony by any other witness as to either of the girls making any statements constituting an extrajudicial identification, there was no violation of the rule stated in *O'Toole v. State, supra.*

Defendant also contends that the court erred in admitting the above-stated testimony of Geraldine Shipley in relation to acts and conduct on February 26, 1945, of the soldier (whom she identified on the trial as the defendant) in taking her hand and talking and walking with her on West Washington avenue until she ran away from him. That testimony was objected to by defendant on the ground that it is not competent in the

prosecution on one crime to introduce testimony of other offenses. The court, in overruling that objection, stated it "is not admitting this testimony on any theory of proving another offense." Again upon the conclusion of the witness' direct examination the court said,—

"We are receiving this evidence upon the point of identification, and on that point only, and not for the purpose of showing any offense committed because the testimony of this little girl does not show any offense committed. It is simply evidence for the jury to consider on the question when the soldier who met Geraldine Shipley, who just testified, on the afternoon of February 26, some time between 3 and 3:40, according to the testimony of this witness, was this same soldier who met Sharon Schunk on the same afternoon about 3:30 according to her testimony. This testimony, I repeat, is not received to prove the defendant committed any offense with Sharon, and is not admitted as evidence of any crime. I will say again, it is admitted only on the point of identity, that is, and I say a third time, whether the soldier who met Geraldine between 3 and 3:40 was the soldier who met Sharon at 3:30 on the same day and in the same locality, at Billy's corner. I hope I make my ruling plain. . . . This testimony by Geraldine is not evidence of any crime committed. She testified to no crime committed."

Likewise, when defendant's counsel objected on the same ground to remarks by the district attorney in his opening statement to the jury as to what he expected to show by proof in relation to the soldier's .conduct and conversation with Geraldine Shipley, the court said,—

"The court is allowing this statement to be made by the deputy district attorney and proposes to let the evidence be introduced purely upon the point of identity, which means he, this defendant, the man who is guilty of the offense if any against the Schunk girl. That is the only purpose of admitting this testimony."

And in instructing the jury at the close of the trial the court said,—

"In this case the testimony of Geraldine Shipley was admitted into the evidence which allegedly showed that the defendant met Geraldine Shipley at a point near the place where the defendant allegedly met Sharon Schunk. This testimony of Geraldine Shipley was admitted in evidence for the sole purpose of proving the identity of the defendant and should not be considered by you as evidence of the commission of the crime. The testimony of Geraldine Shipley was admissible merely to show that the defendant was at a location near where the crime was first commenced. The content of any alleged conversation between the defendant and Geraldine Shipley should not be considered by you in determining the probability or improbability of the alleged acts of indecent liberties on Sharon Schunk."

Thus the court consistently and clearly and explicitly informed the jury that the testimony in question of Geraldine Shipley was admitted and could be considered by the jury only for the sole purpose of determining the identity of the defendant and should not be considered as evidence of the crime or in determining the probability or improbability of the alleged acts of indecent liberty on Sharon Schunk. For that sole purpose Geraldine Shipley's testimony was admissible in so far as it tended to identify defendant as the soldier who was in the neighborhood where he met Sharon a little later. And Geraldine's testimony as to what he said to her, and his conduct and in what circumstances, and how long they were together were all material as bearing upon her opportunity to observe him and the credibility of her subsequent identification of him. If these facts result incidentally in reflecting discredit upon him, that did not render her testimony inadmissible. As we said in *Herde v. State,* 236 Wis. 408, 295 N. W. 684,—

"Testimony concerning the other offenses may be permissible under the exception to the rule for the purpose of identifying the defendant. 1 Wharton, Criminal Evidence (11th ed.), p. 507, sec. 348. The criminality of conduct is no reason for excluding evidence of that conduct when it is relevant and admissible. As said in *People v. Walters,* 98 Cal. 138, 141,

32 Pac. 864, 'but whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion.' The evidence objected to identified defendant as the one who stole the car and drove it at the time of the perpetration of the robbery of Rineheimer." (p. 410.)

As is stated in 1 Wharton, Criminal Evidence (11th ed.), p. 532, sec. 352,—

"Like crimes, committed against the same class of persons, at about the same time, tend to show the same general design, and evidence of the same is relevant and may lead to proof of identity."

"It is relevant, also, to show that the accused was in the vicinity about the time the crime is alleged to have been committed." (p. 278, sec. 236.)

On the other hand, as the testimony in question was admissible on the question of identity, there are not in point the decisions relied upon by defendant in support of the general rule that in a prosecution for a particular offense proof of other unrelated offenses committed by defendant is usually not admissible.

Defendant also claims he was prejudiced by the district attorney's remarks in his opening statement to the jury that he expected to prove that the soldier had made some statements which Geraldine Shipley called "nasty;" and also that the soldier had likewise spoken to four or five other little girls. Upon concluding the taking of testimony defendant's counsel moved that the court instruct the jury to disregard those remarks. The court expressly granted counsel's request as to the first of those remarks and in addition said,—

"As I said at the beginning of this trial, the statements made by an attorney in a lawsuit, no matter which side they are on, is not evidence in the case,—simply evidence of what they may

prove. You will be governed entirely by what is proven and by the instructions of the court."

In view of these rulings, in connection with the above-quoted instructions given by the court, throughout the trial, in relation to statements as to what the prosecution expected to prove, we are satisfied that the jury was sufficiently cautioned to fully understand that such statements were not evidence in the case and that the jurors were to be governed entirely by what is proven and the court's instructions.

Defendant claims that by reason of the use by the court of the following italicized words in ruling that it—

"is allowing this statement to be made by the deputy district attorney and proposes to let the evidence be introduced purely upon the point of identity, *which means he, this defendant, the man who is guilty of the offense if any against the Schunk girl.* That is the only purpose of admitting this testimony,"

the jury might well have inferred that this was an intimation of guilty coming from the lips of the judge. If those italicized words can be deemed to admit of such an inference, it would clearly be so contrary to the obvious purport of all of the court's statements in its similar rulings and final instructions quoted above in relation to remarks made in his opening statement by the district attorney as to testimony which he expected to offer upon the point of identity, that there would seem to be some error in that italicized clause as it is worded in the reporter's transcript. Everything reported elsewhere in the transcript as to the statements by the judge in reference to such remarks and to the testimony which was to be and was subsequently admitted is wholly inconsistent with any notion or intimation on the part of the judge that before he began hearing the evidence the defendant was guilty. Moreover it does not appear,—and it seems highly improbable,—that on the oral pronouncement of that ruling either the attorneys or

the jurors inferred therefrom that there was any such intimation of guilt. Because of the desire to expedite the disposition of this case on the appeal, all of the attorneys consented to the submittal thereof without the usual settlement and approval by the trial court of a bill of exceptions. Instead there is merely a transcript of the proceedings prepared by the phonographic reporter of the court and, apparently, due to the haste with which he was required to complete doing that within only twelve days after the commencement of the trial on May 12, 1945, he may have happened to leave out the word "is" after the word "means" in the italicized portion of the ruling. With "is" inserted there the clause would read "which means is he, this defendant, the man who is guilty of the offense, if any, against the Schunk girl." That is in accord and consistent with all of the other rulings and instructions of the court on the subject, and under all the circumstances it is our conclusion that there was no prejudicial error in this respect because of which there should be a reversal.

Error is also assigned on the ground that the court denied defendant's motion to strike out as incompetent, irrelevant, and immaterial all testimony given by the police department's superintendent of the bureau of identification in respect to taking fingerprints and photographs of defendant on March 29, 1945, and making records of his height, weight, and also his birth, as to which he stated he was born on November 8, 1911, and was thirty-one years of age. As the motion was to strike out "all of this testimony," and that part thereof stating that defendant was thirty-one years of age was in relation to a matter which had to be proven to establish that he was over the age of eighteen years, in order to sustain a conviction under sec. 351.34, Stats., it was not error to deny that motion. But, moreover, there cannot be sustained defendant's contention that the evidence in relation to taking fingerprints and photographs of defendant was elicited to impress the jury with the fact that here was a dangerous criminal

as to whom the police department took no chances of not being able to identify him should he escape; and that therefore the introduction of the evidence violated all sense of fair play and defendant was prejudiced thereby in the eyes of the jury to his irreparable detriment. In this age and particularly in these times it is a matter of common knowledge that it has become customary and considered proper in private business and industry, as well as in public service and institutions, to take photographs and fingerprints of individuals, who are connected therewith or engaged or detained therein, for their identification for many other purposes or respects than in criminal matters. It is commonly known that such photographing and fingerprinting is a matter of daily practice and the usual method of identification used in the police service in populous communities of persons arrested,—but not yet convicted,—for violations. The use of that practice and method is considered to be for the common good and the rights of police authorities to resort thereto has been recognized in most jurisdictions, and such use thereof is, in itself, not considered a badge of crime. As a physical invasion it amounts to almost nothing, and as a humiliation or stigma it can never amount to as much as that caused by the publicity attending the arrest on a sensational charge to which innocent men may have to submit. *United States v. Kelly* (2d Cir.), 55 Fed. (2d) 67, 83 A. L. R. 122; *Shaffer v. United States,* 24 App. D. C. 417; *Downs v. Swann,* 111 Md. 53, 73 Atl. 653, 23 L. R. A. (N. S.) 739; *Hodgeman v. Olsen,* 86 Wash. 615, 150 Pac. 1122, L. R. A. 1916 A, 739. Consequently there is no occasion to conclude that the proof of photographing and fingerprinting was prejudicial to defendant.

It is contended also that defendant did not have a fair trial because the state did not introduce a report subsequently written by Police Matron Clark in relation to matters which occurred or were said during the investigation made by her and Officer Nee on the night of February 26, 1945, after their

arrival at the Schunk residence. Mrs. Clark was not a witness on the trial and there was no reference then to the report until, on cross-examination, Nee was questioned in relation thereto by defendant's counsel and produced the report on the latter's request. It was then offered in evidence by the defense and admitted without any objection. Consequently as the report was in evidence and as available to the defense for its purposes as if it had been placed in evidence by the state, there is no basis for defendant's contention that because the state did not introduce the report, he did not have a fair trial. Because of matters stated in that report, and also because of some matters stated in other evidence, defendant contends the evidence herein is so conflicting,—with a preponderance in favor of the story told by Sharon to Officers Nee and Clark on the night of the assault,—that the evidence upon which the state relies fails to meet the requirements as to the proof necessary to sustain a conviction in a criminal action. These contentions cannot be sustained for the reasons stated above in discussing the evidence and the sufficiency thereof as to the facts that warrant the jury's verdict.

Defendant's contentions in relation to errors assigned in several other minor respects likewise cannot be sustained; and as no useful purpose will be served by the discussion thereof here, there is no occasion to do so.

*By the Court.*—Judgment affirmed. The stay of execution heretofore granted in this case is vacated and the plaintiff in error is remanded to the custody of the sheriff of Dane county for execution of the sentence.

The following opinion was filed September 11, 1945:

FRITZ, J. (*on motion for rehearing*). On his motion for a rehearing defendant contends, for the first time on this appeal, that the omission (apparently by oversight) to arraign defendant and have issue joined before commencing the trial and drawing and swearing the jury, constituted prejudicial

error because of which he is entitled to a reversal of the judgment and a new trial. Upon the oversight being brought to the attention of the trial court, the defendant, without objecting thereto, was promptly arraigned, and pleaded not guilty, and participated in proceeding with the trial on the issue thus joined. Under these circumstances and the absence of any showing that he was prejudiced in some manner by reason of the delay in his arraignment and his plea to the information, the defendant will be deemed to have waived the right to a more timely arraignment and plea. As this court said in *Hack v. State,* 141 Wis. 346, 353, 124 N. W. 492, "The principle now declared is that the right of arraignment and plea will be waived by the defendant by his silence when he ought to demand it, in all cases (except capital cases) where it appears that he is fully informed as to the charge against him and is not otherwise prejudiced in the trial of the case by the omission of that formality."

Likewise, in the absence of any objection by defendant to the sufficiency of the information, or to the correction thereof to read "circuit court" by an amendment on the trial, defendant is deemed to have waived any defect therein. Secs. 355.09, 357.19, Stats.; *Perrugini v. State,* 204 Wis. 69, 234 N. W. 384; *State v. Bachmeyer, ante,* p. 294, 301, 19 N. W. (2d) 261.

The discussion in respect to other matters in defendant's brief, on his motion for a rehearing, is in relation to matters and contentions which were heretofore so fully discussed by his counsel and carefully considered in rendering our decision herein that there is no necessity or occasion for any further hearing or argument in relation thereto.

*By the Court.*—Motion denied.