STATE EX REL. HARRIS, Appellant, v. SCHMIDT, Secretary, Department of Health & Social Services and another, Respondents.

*No. 561. Argued May 8, 1975.—Decided July 8, 1975.*
(Also reported in 230 N. W. 2d 890.)

For the appellant there was a brief and oral argument by *Howard B. Eisenberg*, state public defender.

For the respondent the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

DAY, J. This is an appeal from a judgment entered in the Kenosha county court on August 5, 1974, affirming the revocation of appellant's probation.

On September 12, 1969, the appellant James H. Harris (hereinafter "defendant") was found guilty by a jury of taking indecent liberties with a minor and of sexual perversion, in violation of secs. 944.11 (2) and 944.17 (1), Stats. On December 17, 1969, the defendant was sentenced in the county court of Kenosha county to five years on the first count and three years on the second count, such terms to run concurrently; the sentence was stayed, and the defendant was placed on three years' probation, the first six months of which were to be served in the Kenosha county jail during nonworking hours.

In June, 1972, defendant's probation was transferred to the state of Tennessee, where he moved with his wife and her two young sons by a previous marriage. Defendant's probation was due to be terminated on December 17, 1972. On November 3, 1972, Mrs. Harris left her husband at Humboldt, Tennessee, and returned to Wisconsin. On November 4th she saw his probation officer in Wisconsin and based on statements made by her to him, a probation violation warrant was issued November 27, 1972, in Wisconsin, by the then administrator of the division of corrections, department of health and social services, alleging that defendant violated rule one of his probation agreement by committing or attempting to commit sodomy on his wife's five-year-old son on November 2, 1972. Agents of the department of social services

traveled to Tennessee and took the defendant in custody on November 27, 1972; he was returned to Wisconsin and has been incarcerated since that time. On December 19, 1972, defendant was notified of a preliminary hearing beginning the proceedings to revoke his probation. Such hearing was apparently held on December 21, 1972, and resulted in a finding that there was probable cause to hold the defendant for a full hearing.

Prior to the full hearing, defendant through his counsel demanded that the place of the hearing be transferred to Humboldt, Tennessee, the place of the alleged act which gave rise to the revocation proceedings, so that exculpatory witnesses would be available to him; in the alternative, he argued that some other procedure, such as depositions, should be devised whereby the testimony of witnesses in Tennessee could be secured; these requests were denied.

His full probation revocation hearing was conducted on January 31, 1973, in Kenosha by a hearing examiner employed by the department. No provision was made for conducting the hearing or any part of it in Tennessee or for taking depositions of witnesses there. After the hearing was concluded, defendant was able to get affidavits from some of his potential witnesses and the hearing examiner received and considered them.

On March 16, 1973, the secretary of the department of health and social services executed a probation revocation order requiring the defendant's imprisonment.

Mrs. Harris testified at the January 31, 1973, revocation hearing that on November 2, 1972, the defendant drove her to work at about 11:30 a.m. Prior to that the son in question had left for kindergarten and she said he either walked or that the defendant drove him to school. She also said that a close friend of her husband had stopped that morning at about 8 or 8:30 to borrow something. She testified she did not see her husband again that day until 4 or 4:15 p.m. when he came to the restaurant where she was employed to get a package of cig-

arettes. She said her two sons were with him and that he told her he was taking them to his mother's house. The defendant picked his wife up at work at about 8 or 8:15 p.m. and they then went to his mother's house where the two boys were waiting. She testified that the next morning between 8:30 and 9 o'clock the defendant had already left the trailer where they lived and gone to see his mother. She said between 9 and 9:30 a.m. the son in question, who was five years old, came to her and described an episode between him and the defendant from the prior day that indicated the defendant either did have or tried to have anal intercourse with the boy. Sometime between 9:30 and 10 a.m. on November 3d the defendant returned to the trailer and she confronted him with what she said her son had told her; the defendant denied the accusation. She testified she decided to leave her husband and return to Wisconsin with her children and that he drove her to the bus station, arriving there about 10:30 a.m. She said he talked her out of leaving and they went shopping and she bought a pair of slacks; they also stopped at his mother's house briefly, before Mrs. Harris went to work. That afternoon between 2 and 2:30 Mrs. Harris said she changed her mind about leaving. She also called the chief of detectives of the Humboldt police department and reported what her son allegedly told her. In a letter to the defendant's hearing counsel, this detective stated that he interviewed Mrs. Harris at her place of employment about 2 o'clock on November 3, 1972, and she related the episode described by her son. The detective then interviewed the boy and he made a similar statement. The detective told Mrs. Harris it was very important to his investigation that she have the boy examined by a physician but she refused. According to the detective, she said she just wanted to get her children away from her husband. She refused to cooperate and the detective concluded Mrs. Harris' conduct in the matter was very suspicious. Mrs. Harris testified that the reason she did not cooperate with the authorities was because

she had no one to turn to and she also said that she had received a threatening phone call from the defendant's brother. On November 6, 1972, the boy was examined by a doctor but the results of the examination were inconclusive.

At the revocation hearing the probation agent for the defendant testified that Mrs. Harris contacted him on November 4, 1972, and related the story she said she had gotten from her son. On November 17, 1972, he interviewed the boy and the child related the same thing to him. It was on this basis that the probation agent recommended that a probation-violation warrant be issued. He said it was done without making any other investigation and without receipt of any information from Tennessee.

The defendant's testimony is at variance with that of Mrs. Harris. The defendant, who was forty-nine years old at the time of these events, testified that on November 2, 1972, he arose about 6:30 a.m.; fed the two boys; went to his mother's for up to an hour; and returned to find his friend Wayne Pickard at the trailer. Mr. Pickard took the boy to school and Mrs. Harris to work. He then returned and took the defendant and the other boy, a three year old, to defendant's mother. The defendant and Mr. Pickard then went to do some work. The two of them visited a friend and about 3 p.m. picked up the boy in question at school; they then left him at the defendant's mother's and the two men went to a pool hall. At about 7:30 p.m. the friend dropped the defendant off at his mother's house where defendant got his own car and went to get his wife at work. He said they had dinner and then went to his mother's to get the boys. The defendant testified that on the following day, November 3, 1972, he arose early, fed the boys, visited his mother, and returned to the trailer. He then left with his wife and the two boys and went shopping and his wife purchased some clothes; they visited his mother and his wife had her hair done. He dropped her off at work and took the boy in question to school and then went to his mother's with the younger

boy. Later that afternoon he picked up the boy at school, visited his wife briefly and returned to his mother's with the older boy. Shortly thereafter Mrs. Harris arrived and demanded to be taken to the bus station; she said that it was nothing that any of them had done but "I just got to get out of here." The defendant testified that she was shaking all over; he said he took her to the bus station and she left. He said his wife never told him anything about him having assaulted the boy and that she never did give him a reason for leaving.

After Mrs. Harris left, the defendant was contacted by two Tennessee probation officers who advised him that his wife wanted him arrested. The defendant said that they told him it involved the boy but were not specific as to the charges, although the report from the probation officers indicates that they had told him in more detail what her allegations were. These probation officers made a report in which they indicated the whole episode was probably a domestic quarrel. Certain of the witnesses that the defendant said would testify for him if the hearing were held in Tennessee did submit affidavits. His mother and sister-in-law said in affidavits that the boy to their personal knowledge was at the defendant's mother's house from immediately after school until he was picked up by both of his parents on the evening of November 2d. Another affiant said she was at the defendant's mother's house and saw the boy left there after school at about 3 p.m. The defendant's friend accounts for the day in his affidavit much as the defendant did in his testimony, claiming he was with the defendant throughout and that the boy was dropped off at the defendant's mother's. There were inconsistencies in the affidavits and the hearing examiner stated:

"Although these inconsistencies don't appear to be fatal to the general intent of the affidavits, they do point out that there was a good deal of confusion surrounding the comings and goings of the various individuals involved. . . .

"Mr. Harris and all of his affiant corroborators indicate that, if you would believe them, he didn't have an opportunity to molest the boy during that period of time. I choose not to believe Mr. Harris or any of his affiant corroborators with reference to the specific time of day involved. I believe that an assault took place."

The hearing examiner relied in part on the results of a polygraph examination administered to Mrs. Harris by a detective on the Kenosha police force which indicated she was telling the truth.

It was brought out that during their marriage, they had frequent marital difficulties. They were married on July 20, 1970. Defendant testified his wife threatened to leave him many times; they had separated at least twice. Once she contacted his probation officer and had the defendant jailed for two weeks for striking her, and on several occasions she had contacted the probation officer to inform him of activities of her husband which she considered to be probation violations. On March 7, 1973, the hearing examiner recommended that the probation be revoked and an order to that effect was issued by the department on March 16, 1973.

On April 26, 1973, the defendant brought a petition for a writ of certiorari in the county court to review his probation revocation. Such writ was issued on April 30, 1973. On October 31, 1973, judgment was entered affirming the revocation and the defendant appealed to this court; that appeal was dismissed on April 24, 1974, on the ground the county court had no jurisdiction to issue the writ in the first place. On May 31, 1974, ch. 217, Laws of 1973, became effective and certiorari was thereby extended to county courts.[1] The defendant then moved to refile the original certiorari petition and the motion

[1] "253.11 Civil jurisdiction. (1) Except as otherwise provided in s. 252.017 for family court actions in counties having a population of 500,000 or more, the county court has jurisdiction of all actions to foreclose a land contract, mortgage or lien concurrent with the circuit court and of all other civil actions and special proceedings of

was granted on July 22, 1974, by the county court. On August 5, 1974, the court entered a memorandum opinion and judgment affirming the department's order of revocation. It is from this judgment that this appeal was taken.

The principal question on this appeal is whether or not the defendant was denied due process of law by virtue of the state's refusal to hold either the preliminary revocation hearing or the final revocation hearing in Tennessee, the place where the alleged violation occurred. We conclude that such failure did amount to a denial of due process under the facts of this case.

Other questions as to the admissibility of the results of the polygraph examination and reliance by the examiner entirely upon hearsay testimony and whether or not these constituted prejudicial error will be discussed in the opinion.

Prior to the final revocation hearing on January 31, 1974, defendant's appointed counsel requested in writing that the hearing be transferred to Humboldt, Tennessee, or, alternatively, that some procedure be established for taking depositions of material witnesses in Tennessee; this request was repeated orally at the outset of the hearing. The purpose of the request was to secure witnesses who would tend to disprove the allegations made by the department. The counsel and the defendant had apparently been advised that some witnesses would voluntarily be present in Kenosha at the hearing and they were expecting their arrival until the time the hearing actually began. The counsel named four specific witnesses who would be material and said there may be others. These

---

all kinds concurrent with the circuit court except actions for the extraordinary remedies of certiorari, prohibition and quo warranto except that the county court has concurrent jurisdiction with the circuit court for actions for the remedy of certiorari for the limited purpose of reviewing a probation or parole revocation."

four did supply affidavits. The defendant testified that he made several phone calls and wrote several letters to try to get the witnesses to come to Kenosha. His counsel also talked to some of the potential witnesses by phone and said he found them difficult to deal with; he said he would not draw up an affidavit in Wisconsin and then send it to Tennessee for signing without talking to them in person. He then said that some witnesses advised him they would get an attorney to assist them in Tennessee. Counsel concluded that:

"I just can't see any likelihood of being able to get anything via long distance. I think you've got to get these people eyeball to eyeball."

The hearing examiner said that the defendant could present whatever testimony he had and that, in the absence of witnesses, he could submit affidavits or other documents. He stated the law does not provide for moving the place of hearing or transporting witnesses to the hearing or obtaining depositions. This was also the position taken in a letter to counsel from the administrator of the department, who also stated that if the testimony could not be adequately presented by affidavit, the hearing examiner should recess the hearing and take steps to hold the hearing in Humboldt, Tennessee, or take depositions if the hearing examiner found it necessary. The hearing examiner did not find such a need.

*Morrissey v. Brewer* (1972), 408 U. S. 471, 484, 485, 488, 489, 92 Sup. Ct. 2593, 33 L. Ed. 2d 484, held that one accused of a parole violation is entitled to a two-staged hearing process to determine whether parole should be revoked. First, a preliminary hearing is held to determine whether there is "probable cause or reasonable ground," to believe that the alleged violation occurred. Second, the full revocation hearing is held to determine whether such violation did in fact occur. The court said that:

"What is needed is an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by *an accurate knowledge of the parolee's behavior.*" (Emphasis added.)

The court went on to note that occasions may arise where the parolee is arrested or accused of a violation at a place far distant from the institution to which he would be returned if parole were revoked. In such a situation the court said that:

". . . due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available."

This requirement seems very clearly to flow directly from the court's determination that among the "minimum requirements of due process" is the "opportunity to be heard in person and to present witnesses and documentary evidence." The hearing, or at least the preliminary, must be held at or reasonably near the place of the alleged parole violation because, when the institution the accused is to be returned to is distant, this is the only means by which the accused can present his own witnesses. It is the only place where sources are available. The *Morrissey* requirement of locality is nothing more than a recognition that the minimum due process requirements demand that the accused be allowed to present witnesses in his behalf. *Morrissey* did not elaborate on this requirement; it merely stated it. Some elaboration came a year later in *Gagnon v. Scarpelli* (1973), 411 U. S. 778, 93 Sup. Ct. 1756, 36 L. Ed. 2d 656, which applied all the *Morrissey* requirements for parole revocations directly to probation revocation. In *Scarpelli,* at page 782, footnote 5, the court said:

"[Prison warden] argues, in addition, that the *Morrissey* hearing requirements impose serious practical problems in cases such as the present one in which a probationer or parolee is allowed to leave the convicting

State for supervision in another State. Such arrangements are made pursuant to an interstate compact adopted by all of the States, including Wisconsin. Wis. Stat. Ann. § 57.13 (1957). [Prison warden's] brief asserts that as of June 30, 1972, Wisconsin had a total of 642 parolees and probationers under supervision in other States and that incomplete statistics as of June 30, 1971, indicated a national total of 24,693 persons under out-of-state supervision. Brief for [prison warden]. . . .

"Some amount of disruption inevitably attends any new constitutional ruling. We are confident, however, that modification of the interstate compact can remove without undue strain the more serious technical hurdles to compliance with *Morrissey*. An additional comment is warranted with respect to the rights to present witnesses and to confront and cross-examine adverse witnesses. [Prison warden's] greatest concern is with the difficulty and expense of procuring witnesses from perhaps thousands of miles away. While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence. Nor did we intend to foreclose the States from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the *Morrissey* requirements."

The question here is, was the testimony that the defendant desired to elicit from witnesses under the facts in this case the type for which there is "simply no adequate alternative" to live testimony or was this the kind where a mere affidavit would suffice? Inevitably live testimony is to be preferred to a deposition or affidavit, but in a situation such as this one must bear in mind the nature of the testimony that the probationer wishes to present. If that testimony is merely cumulative or is merely testimony of a general background or character nature, the requirement for live testimony is not as strong. But if the testimony is to be directly and unequivocally exculpatory, rather than merely background testimony which militates in favor of the probationer in

only a general way, then it weighs more heavily. Some sort of hearing near enough to the place of the alleged violation so as to allow the accused to procure his witnesses seems especially essential when a decision to revoke entails compelling the probationer to travel great distances and thereby lose not only his freedom but his proximity to his new home where, as here, he had established roots with his family—roots that had been permitted to develop by the decision of the department to permit his probation to be transferred to the state of Tennessee. The state, of course, has an interest in avoiding unnecessary revocation of probation or parole and hence providing procedural safeguards designed to avoid an erroneous revocation. The defendant here had no exculpatory witness in his behalf available to him in the state of Wisconsin. Such testimony by the witnesses in Tennessee was not merely cumulative; it was the only testimony. It seems to a majority of this court that it was a denial of due process not to have held either the preliminary or the final revocation hearing in Humboldt, Tennessee. The department was fully informed of what witnesses the probationer wanted, what they would say, and that it was directly exculpatory and not cumulative of anything except defendant's own testimony. The defendant had no evidence to substantiate the testimony of these Tennessee people except his own word. The department even refused to establish a procedure whereby the defendant could depose these people. The testimony for the state given by Mrs. Harris was definite and unequivocal that these events had occurred on November 2, 1972. But the testimony that the defendant wished to offer by live witnesses in Tennessee, if believed, would have shown that the defendant had no opportunity to commit the acts alleged. It is not enough in such a case to say one disbelieves an affidavit to that effect. This is a case where live testimony and the opportunity to examine and cross-examine should have been given. It is necessary to give the defendant a hearing that comports

with the requirements of the due process clause of the United States Constitution; a reversal is required in this case.

The next question is, was it prejudicial error to admit the results of the polygraphic examination of Mrs. Harris in the probation revocation hearing? After Mrs. Harris told her husband's probation agent about the defendant's alleged activities, he requested her to take a polygraph examination. He wished to determine whether or not she was telling him the truth. The examiner's report is contained in the record and he concluded she was telling the truth about the boy's telling her this story and that she believed it. The probation agent stated the results of the polygraph test were one of the factors he considered in recommending revocation of the defendant's parole.

Counsel for defendant at the hearing objected to the acceptance by the hearing examiner of the results of the polygraph test. The overruling of that objection is raised as error on this appeal.

In *State v. Stanislawski* (1974), 62 Wis. 2d 730, 742, 743, 216 N. W. 2d 8, this court modified Wisconsin law to allow the admission of the results of a polygraph test into evidence at a trial under the following conditions:

"(1) That the district attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs, and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial court, *i.e.*, if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"(a) the examiner's qualifications and training;

"(b) the conditions under which the test was administered;

"(c)   the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"(d)   at the discretion of the trial court, any other matters deemed pertinent to the inquiry.

"(4)   That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate whether at the time of the examination defendant was telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given."

In the instant case, there was no stipulation, nor was there a waiver. The counsel for the defendant objected to the receipt of the polygraph results. In addition, there was no opportunity to cross-examine the polygraph operator. The record is clear that the qualifications of the operator were unknown and the record also brought out that Mrs. Harris had a history of mental illness, that she was an epileptic and was taking medication for her epilepsy at the time of the polygraph examination. She testified that she had been hospitalized three weeks for a nervous breakdown in 1970 and had attempted suicide on two occasions. She stated she had been an epileptic since she was eleven years; that she was twenty-nine years of age at the time of hearing and was taking two drugs as medication for her condition at that time. She testified the polygraph examiner did not ask about any history of mental illness. First she said she did not know whether he asked any questions about her health or whether she took medication; later she testified she thought that he knew about her condition and her medication. What the examiner would have said as to whether or not these factors had an influence on the outcome of the test, we do not know because he was not asked.

It was certainly proper for the probation agent to have Mrs. Harris take the polygraph exam for purposes of satisfying himself as to her veracity. This is not an un-

common practice in police work. However, before the results of a polygraph test on one of the state's witnesses may be considered at a probation or parole revocation hearing or made a part of the record, there must be a written consent to the admission of such test by the probationer or his attorney. Admissibility of the test results is subject to the discretion of the hearing examiner and if he is not convinced that the examiner is qualified or that the test was conducted under proper conditions, he may refuse to accept such evidence. If the graphs and examiner's opinion are offered in evidence, then the opposing party shall have the right to cross-examine the polygraph examiner respecting the examiner's qualifications and training, the conditions under which the test was administered, the limitations of and possibilities for error and the techniques of polygraphic interrogation and, at the discretion of the hearing examiner, any other matters deemed pertinent to the inquiry. It appears that the hearing examiner did rely on the test since the credibility of Mrs. Harris was the principal point of issue at the hearing and therefore the error in admitting the results was prejudicial.

The next question is, was the admission and reliance upon the hearsay evidence with regard to the boy's statements to his mother and to the defendant's probation agent prejudicial? We conclude that it was not. The statements this five-year-old boy made to his mother and to the probation agent were received over objection and in fact amount to the only testimony in the case that, if believed, would justify the revocation. There was no other evidence available. We conclude that although the statements were made on the 3d of November about an incident occurring on the 2d of November they still meet the requirement in the case of a child of this age—the alleged victim of a sexual assault—as an excited utterance exception to the hearsay rule. Sec. 908.03, Stats., provides:

"**908.03 Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as witness: . . .

"(2) EXCITED UTTERANCE. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. . . ."

A broad and more liberal interpretation is given to what constitutes an excited utterance when applied to young children especially when the child is alleged to have been the victim of sexual assault. *Love v. State* (1974), 64 Wis. 2d 432, 219 N. W. 2d 294; *Bertrang v. State* (1971), 50 Wis. 2d 702, 184 N. W. 2d 867; *Bridges v. State* (1945), 247 Wis. 350, 19 N. W. 2d 529, 19 N. W. 2d 862. The hearing examiner found that because of the nature of the charge and the age of the alleged victim it was reasonable to excuse the nonproduction of the boy at the hearing. We agree. This conforms to our holding in the *Bertrang Case;* it also complies with the requirements of *Morrissey,* page 489, where it was held that at revocation hearings the probationers have:

". . . the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)."

The hearing examiner did not abuse his discretion under *Morrissey* and *Bertrang* in not having the five-year-old boy produced for either examination or cross-examination, and it was not error in admitting hearsay statements by the boy concerning the incident made to his mother the next day, later to the probation agent, and to his mother at a later time about other facets surrounding the incident.

*By the Court.*—Judgment reversed, and defendant discharged.

ROBERT W. HANSEN, J. *(dissenting)*. The defendant, on probation for indecent liberties with a child and sexual perversion, was found by the hearing examiner to have violated the terms of his probation by committing an act of sexual perversion upon his five-year-old stepson. Three issues are raised as to the hearing conducted.

*Admission of hearsay testimony.*

Evidence adduced at the defendant's revocation hearing included hearsay statements offered by the defendant's probation officer and defendant's wife, mother of the five-year-old stepson of defendant. Both testified that the five-year-old boy had told them that "daddy put his ding dong in my butt" and that "daddy spit on himself" during the act. Defendant's wife testified that such method of self-lubrication was a custom and idiosyncrasy of defendant. Corroborating evidence was as to redness and soreness in the boy's rectal area and difficulty with bowel movements following the alleged incident. The defendant complains that the testimony of the boy's mother and defendant's probation officer should not have been admitted into evidence. The majority holds the statement by the boy to his mother, the day after the alleged assault, to be admissible as an "excited utterance" under the statute.[1] The writer agrees that even at the time of formal trial the statement made by the child to his mother was admissible ". . . as a part of the *res gestae* or as described in the newly adopted code of evidence as an excited utterance."[2] However, as to statements made by the child to both his mother and the

---

[1] Sec. 908.03 (2), Stats.

[2] *Love v. State* (1974), 64 Wis. 2d 432, 442, 219 N. W. 2d 294, holding admissible at time of trial the mother's testimony as to what her three-and-one-half-year-old daughter told her the morning after an alleged sexual assault.

probation officer, the writer would add that a probation revocation hearing ". . . need not be a formal trial-type hearing and that technical rules of evidence need not be observed." [3] As the United States Supreme Court has said, ". . . there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." [4] The writer would hold that the statements of the five-year-old boy to his mother and the probation officer were admissible at the probation revocation hearing.

*Locale of revocation hearing.*

In the *Morrissey Case,* above cited, the United States Supreme Court ruled that a paroled prison inmate, accused of violating the conditions of his parole, is to be afforded a probable cause hearing to be conducted ". . . at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest . . . ." [5] Subsequently, in *Scarpelli,*[6] the nation's high court dealt with ". . . the difficulty and expense of procuring witnesses from perhaps thousands of miles away" for the *Morrissey*-mandated place-of-violation preliminary hearing for out-of-state parolees. *Scarpelli* made clear that ". . . we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, deposi-

---

[3] *State ex rel. Johnson v. Cady* (1971), 50 Wis. 2d 540, 549, 185 N. W. 2d 306.

[4] *Morrissey v. Brewer* (1972), 408 U. S. 471, 489, 92 Sup. Ct. 2593, 33 L. Ed. 2d 484.

[5] *Id.* at page 485.

[6] *Gagnon v. Scarpelli* (1973), 411 U. S. 778, 93 Sup. Ct. 1756, 36 L. Ed. 2d 656.

tions, and documentary evidence." [7] Since *Scarpelli*,[8] the state department of health and social services has conducted preliminary hearings in the supervising state for out-of-state parolees and probationers, requesting the supervising state to conduct such probable cause hearing or, if it refuses, sending one of its examiners to conduct such hearing. With the complainants, mother and child, having moved to Wisconsin, the probable cause hearing as to probation violation in the case before us was held in this state, not in Tennessee where the alleged sexual assault took place. The defendant does not claim that, under *Morrissey*, he was entitled to have the probable cause hearing held in Tennessee. He contends rather that, with the probable cause hearing having been held in Wisconsin, he was entitled to have the final revocation hearing shifted from this state to Tennessee.

The narrow issue here presented is whether this hearing examiner, on this record and under these circumstances, was constitutionally required to move the final revocation hearing from this state to the state of Tennessee. On this record and under these circumstances the writer would hold that he was not required so to do. The majority opinion of this court states that: "Prior to the full hearing, defendant through his counsel demanded that the place of the hearing be transferred to Humboldt, Tennessee . . . ." That does not completely describe what the hearing examiner was requested to do. At the time

[7] *Id.* at page 783, footnote 5.

[8] The decision in *Gagnon v. Scarpelli, supra,* footnote 6, was handed down by the United States Supreme Court on May 14, 1973. The defendant's preliminary hearing was held in Kenosha, Wisconsin, on December 21, 1972. The defendant's final revocation hearing was conducted on January 31, 1973. The state contends that at the time the defendant's preliminary hearing was held, there was no constitutional mandate that required the state of Wisconsin to conduct the preliminary hearing in another state. Since *Scarpelli* clarified but did not modify the *Morrissey* holding, we do not see the issue of applicability of *Scarpelli* as controlling here.

of the final revocation hearing, defendant's counsel then informed the hearing examiner that "certain requests were made" by the defendant in a letter, dated January 12, 1973, addressed to the administrator of the division of corrections. Defendants' counsel stated: "Among the requests in that letter were that the administrative hearing be transferred to Humboldt, Tennessee, the place of the alleged violation of probation; secondly, that if that request be denied, procedure be established for taking depositions of material witnesses within the State of Tennessee . . . ." What is now termed a "demand" was then termed a "request," and, equally important, a request framed in the alternative. It was an "either-or" request, giving the department and its hearing examiner an option to (1) transfer the place of hearing; or (2) establish an alternative procedure for the taking of depositions from witnesses in Tennessee.

Exactly as his "either-or" request suggested, this defendant, with the preliminary hearing having been held in this state, was entitled either to have the final hearing transferred to Tennessee, or to what *Scarpelli* terms "adequate alternative to live testimony." [9] The defendant requested that the alternative procedure be that of the taking of depositions from witnesses in Tennessee. This is an alternative to the taking of live testimony authorized in appropriate cases by *Scarpelli.* [10] With the nature of the testimony to be taken by deposition not identified, [11]

[9] *Id.* at page 783, footnote 5.

[10] *Id.* at page 783, footnote 5.

[11] Defendant's Exhibit 1, letter to defendant's attorney sent by Sanger B. Powers, administrator, division of corrections, department of health and social services, stating in part: "As you do not specify in your letter the identity of the witnesses or the nature of their expected testimony, it is impossible to determine whether their testimony is necessary in order to provide Mr. Harris a fair and impartial determination of the issue. Also you do not specify why it would be impossible to introduce the testimony of the Tennessee witnesses by affidavit."

the administrator of the division of corrections responded
to defendant's letter of request by stating that, if it is
shown at the time of the hearing that the testimony of
the proposed witnesses ". . . could not adequately be
presented by affidavit, . . ." the hearing examiner ". . .
will recess the hearing and undertake the necessary steps
to either hold a hearing in Humboldt, Tennessee, or take
depositions of the material and essential witnesses." [12]
*Scarpelli* lists "affidavits" as well as "depositions" as
available "conventional substitutes for live testimony" in
parole or probation revocation hearings. [13]

So the issue here further narrows as to whether this
defendant was deprived of a constitutional right when he
was given the opportunity to present evidence of defense
witnesses by affidavit, rather than by deposition, as he
had requested. There is a difference between submitting
an affidavit and taking a deposition, but the writer does
not see that difference as having constitutional dimen-
sions. Here the defendant did submit affidavits from his
proposed witnesses: His mother, his sister-in-law and two
friends. All corroborated his direct testimony that he
was elsewhere at the time when his stepson said that he
was sexually assaulted. The evidence submitted by de-
fendant in affidavit form was received by the hearing
examiner and considered by the hearing examiner on the
basic issue of credibility as to the statement made by the
child and as to the denial made by the defendant. The
hearing examiner found the statement by the child to

[12] *Id.*, the letter of the administrator concluding: "I have been
advised by Mr. Schneider [the hearing examiner] that if it is shown
at the hearing that the testimony of the proposed Tennessee wit-
nesses is essential to a fair determination of the issue, and that their
testimony could not adequately be presented by affidavit, he will
recess the hearing and undertake the necessary steps to either hold
a hearing in Humboldt, Tennessee, or take depositions of the ma-
terial and essential witnesses."

[13] *Gagnon v. Scarpelli, supra,* footnote 6, at page 783 (footnote
5).

have been made and to be "spontaneous in nature," and to be believed over and against the testimony by the defendant and affidavits corroborating his testimony.

The defendant requested the right to take depositions of out-of-state witnesses. The defendant was given the right to present affidavits from such out-of-state witnesses. No issue as to right to confront witnesses arises from accepting affidavits rather than depositions. That right is the right to confront and cross-examine adverse witnesses.[14] Here it was the examiner and probation department that lost the right to challenge, check or cross-examine the defendant's friends and relatives as to what they stated in their affidavits. If the department had acceded to the first of defendant's two alternative requests and moved the final hearing to Tennessee, it would have been the mother and probation officer whose affidavits or depositions could, under *Scarpelli*, have been introduced as the "conventional substitutes for live testimony" of such complaining witnesses. Then, but only then, could this defendant claim that he was denied an "eyeball-to-eyeball" confrontation with adverse witnesses. In the case before us, the defendant was not denied the right to present witnesses or documentary evidence. He and his hearing counsel had contacted the mother, sister-in-law and two friends who had, defense counsel informed the examiner, agreed to attend the hearing in Wisconsin and testify. When this entirely reasonable expectation that they would attend and testify was disappointed, the hearing examiner agreed to reconvene the hearing if the

---

[14] *See: Morrissey v. Brewer, supra,* footnote 4, at page 489, referring to ". . . the right to confront and cross-examine *adverse* witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation). . . ." (Emphasis supplied.)

*See also: Gaertner v. State* (1967), 35 Wis. 2d 159, 166, 150 N. W. 2d 370, this court holding: "While in a popular sense we say an accused has a right to face his accusers, we mean 'witnesses against him.' "

witnesses could be produced in the next two weeks. In the alternative, the hearing examiner agreed to accept and consider affidavits from the absent witnesses. Such affidavits were produced by the defendant and accepted and considered as evidence by the examiner. On this record and under these circumstances, the writer finds no denial of a constitutional right in the accepting of the testimony at the hearing in the form of affidavits submitted by the defendant rather than, as he had earlier requested, in the form of depositions taken.

*Admissibility of polygraph testing.*

When the defendant's wife complained to the state department as to the alleged sexual assault committed by the defendant against her five-year-old son, the probation officer requested her to submit to a polygraph examination to be conducted by the polygraph examiner for the Kenosha police department. The polygraph examiner's report was that no deception response was indicated by the wife's answers to relevant questions asked as to the child's having told her that he was sexually violated by the defendant. Defendant's counsel at the revocation hearing objected to the admissibility of the examiner's report stating: "I appreciate the reasons why it was done. But I still assert that those reasons don't make—don't make the evidence of any value in deciding of the questions at hand." The majority agrees, holding that it was error to admit the result of a polygraph test submitted to by a complaining witness, at the request of the state department, in a probation revocation situation.

In the *Stanislawski Case,*[15] this court set forth the requirements for admissibility of testimony concerning polygraph tests in a criminal case at time of trial. Conditions for admissibility were also prescribed as to poly-

[15] *State v. Stanislawski* (1974), 62 Wis. 2d 730, 216 N. W. 2d 8.

graph tests taken by a principal or complaining witness.[16] The majority adapts and applies the *Stanislawski* rule to the admissibility of polygraph tests given by a complaining witness prior to a probation revocation hearing. It would require for admissibility: (1) A written consent to the admission of such test by the probationer or his attorney; (2) admissibility to be subject to the discretion of the hearing examiner; and (3) the right to cross-examine the polygraph examiner respecting the examiner's qualifications and training. In the case before us, the hearing examiner did exercise his discretion as to admitting the test results, and, with the identity of the polygraph tester known, subpoenaing such examiner would have given the right to examine him as to his qualifications. However, the advance written consent of the probationer or his attorney was not secured.

The writer would make advance written consent of a probationer and the department as to admissibility of polygraph testimony applicable only to a test taken by such probationer. The writer would not make the consent of the probationer a prerequisite for admissibility of a polygraph test administered to a complaining witness at the request of the state department. The *Stanislawski* rule was taken from the holding of the Arizona Supreme Court in its *Valdez Case*.[17] When the Arizona court was asked to apply its *Valdez* rule to probation revocation hearings, it declined, holding: "A hearing on revocation

[16] *Id.* at page 743, this court holding: *"As to polygraph tests taken by a complaining or principal witness,* . . . the graphs and expert testimony related thereto are admissible, on the issue of credibility, for corroborative or impeachment purposes, only if the same four qualifications are met: (1) Written stipulation of prosecutor, defense counsel and person taking the test as above required; (2) admission of testimony discretionary with trial court as above provided; (3) opposing party to have a right to cross-examine as above noted; and (4) jury to be instructed as provided above."

[17] *State v. Valdez* (1962), 91 Ariz. 274, 371 Pac. 2d 894.

of probation is not subject to the limitations of a formal trial."[18] The writer would follow the lead of the court that authored what became our *Stanislawski* rule. Particularly so, because, as to probation revocation hearings, our court has held that such hearing is " '. . . not a trial in the traditional sense, . . .' " and " '. . . [b]y its very nature . . . does not envision strict observance of technical rules of law and procedure accorded a judicial proceeding.' "[19] Our court has held that, at a probation revocation hearing: " 'Any relevant information, even though in the form of letters, reports of parole officers, and similar matter, which may aid the board in making its determination, may be considered. . . .' "[20] With that the standard to be met as to evidence admissible at a probation revocation hearing, the writer would find it met by the admission of the polygraph test here, taken by the complaining witness at the request of the state department.

The requirement of advance written consent of the probationer or his attorney for admissibility, will have a chilling effect on the testing of the credibility of persons registering complaints against those on probation and under supervision of the state department. The majority opinion states that it was here certainly proper for the state department to have the polygraph test taken by the mother of the child involved to test her veracity. However, to commend the department for having its representative have the test given and to prohibit the department hearing examiner from considering the results of the test is to ask the left hand to do what the right hand

---

[18] *State v. Goodloe* (1971), 107 Ariz. 141, 142, 483 Pac. 2d 556, citing *State v. Crowder* (1968), 103 Ariz. 264, 440 Pac. 2d 29; *State v. Maxwell* (1965), 97 Ariz. 162, 398 Pac. 2d 548.

[19] *State ex rel. Johnson v. Cady, supra,* footnote 3, at page 549, quoting *Johnson v. Stucker* (1969), 203 Kan. 253, 453 Pac. 2d 35, 42, certiorari denied, 396 U. S. 904, 90 Sup. Ct. 218, 24 L. Ed. 2d 180.

[20] *Id.* at page 549.

is not to know about. The predictable result of nonadmissibility without advance written consent of the probationer will be to discourage the testing of the reliability of complainants by polygraph examinations, since the result of the testing cannot be used without probationer's consent in reaching the determination as to whether probation has been violated. The writer would move in the opposite direction to encourage the department, when a complaint is lodged as to probation-violating conduct involving commission of a criminal act by a probationer, to urge the person making the complaint to submit to a polygraph test as to truthfulness and veracity. The commendable practice of such testing of the credibility of complainants against probationers is not advanced or served by holding that the results of such polygraph tests given to complaining witnesses are not admissible at probation revocation hearings unless there has been an advance written consent to the testing by the defendant. Polygraph testing of complainants by the state department, with the results admissible for corroborative or impeachment of their testimony at probation revocation hearings, ought be encouraged, not discouraged, by this court.

The writer would affirm, and is authorized to state that Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN join in this dissenting opinion.