STATE of Iowa, Appellee,

v.

Russell James FITZ, Appellant.

No. 58080.

Supreme Court of Iowa.

May 17, 1978.

W. H. Gilliam, of Gottschalk, Patterson & Gilliam, Waterloo, and Richard A. Knock, Cedar Falls, for appellant.

Richard C. Turner, Atty. Gen., J. Susan Carney, Asst. Atty. Gen., David Correll, County Atty., for appellee.

Considered by MOORE, C. J., and MASON, RAWLINGS, UHLENHOPP and REYNOLDSON, JJ.

MASON, Justice.

Russell James Fitz was charged by county attorney's information with the crime of murder in violation of section 690.2, The Code. Trial to Webster County Jury upon change of venue resulted in a verdict convicting him of the crime charged. He appeals from judgment imposed upon that conviction sentencing him to life imprisonment at the state penitentiary in Fort Madison.

The facts giving rise to the filing of the information occurred June 6, 1974, when the strangled and sexually assaulted body of two-year old Shelly Day was found in the attic of the building in which defendant rented an apartment. Entrance to this attic could only be had through a trap door located in the ceiling of defendant's bathroom.

Shelly had been last seen alive at 4:55 p. m. when she was sitting on defendant's knee on the front steps of the building. At 5 o'clock Mrs. Day, Shelly's mother, left the rear entrance of the building intending to go to work and leave Shelly and her older brother, Roger, with their babysitter, a Mrs. Hilmer. She then discovered Shelly was missing. She searched the immediate vicinity but could not find her daughter.

Mrs. Day and Mrs. Hilmer then went upstairs to defendant's apartment. Mrs. Hilmer pounded on the locked door and screamed defendant's name several times. Upon receiving no response from within, they went around to the back door and repeated the pounding and screaming but once again they received no response. They then continued the search elsewhere.

At approximately 5:30 Mrs. Day returned to the front of the building and confronted

defendant who was then sitting on the steps. In response to her questions as to the whereabouts of her daughter, defendant stated he had put Shelly down and had gone up to his apartment to take a nap.

The search for Shelly then continued. By this time the search party consisted of both Mr. and Mrs. Day, several relatives and friends, and police officers. When the search failed to turn up any clue, the investigation turned back to defendant.

At approximately 9:55 two Waterloo police detectives, Penrose and Damon, who had spoken to defendant earlier, asked him to get into their car. They stated they had reason to believe he was involved in the child's disappearance. They advised defendant of his rights which he said he understood. At 10:00 they asked him if they could search his apartment. He agreed.

While detective Damon was searching defendant's bedroom, detective Penrose who was elsewhere discovered there was supposed to be an attic to the building. They asked defendant if he knew of it. He stated he did not have an attic and knew nothing about one. The detectives discovered the trap door to the attic in defendant's bathroom.

The detectives discovered smudges on the moulding of the frame around the trap door. These smudges appeared to have been made by fingers. The detectives then attempted to find something on which to climb into the attic. During this search they discovered defendant going down the front stairs. They asked him to return to the apartment. He complied with their request.

The detectives once again attempted to discover a way to climb into the attic. This time defendant exited by the back stairs and left the vicinity.

Detective Damon finally stood on a vanity and managed to move the trap door over to the side. He then discovered the body of Shelly Day. He called the police station and an identification officer and Lt. Kehoe,

the detective supervisor, arrived on the scene shortly thereafter.

A search warrant was obtained for the remaining portion of the apartment. The ensuing search turned up a blood stained diaper in a drawer of defendant's dresser. The blood stains on the diaper were of human blood but it was impossible to determine the type of the blood.

Shelly had died between 4:30 and 5:00 of suffocation caused by strangulation with an electrical cord around the neck. She had been sexually assaulted but there was no evidence of semen.

The fingerprints on the moulding around the trap door compared favorably with defendant's but they could have been there for as long as three months. In the attic were found record album covers, one of which had on it the thumb print of defendant. Defendant had thrown the covers up into the attic sometime prior to the murder.

Shelly's clothing was analyzed by the Bureau of Criminal Investigation Crime Laboratory. There were fibers on her clothes similar to those found in defendant's bedspread. Other fibers found on her clothes matched those of defendant's bedroom carpet.

Defendant did not return to his apartment but was apprehended between 10:30 and 11:00 o'clock. The officer who apprehended him did not know Shelly's body had been found and had arrested defendant for intoxication. He was then taken to the police station.

At 12:00 or 1:00 a. m. defendant was taken for an interview with a psychiatrist who found him aware of the situation in which he found himself and found him to be well-oriented. This interview lasted one and one half to two hours.

Defendant was then taken to St. Francis Hospital for various tests. Between 3:00 and 4:15 a. m. he was questioned by Lt. Kehoe. Also present were the county attorney and a police sergeant. A tape recording was made of this interview.

Other facts will be presented when deemed necessary to a consideration of the problems presented by this appeal.

Defendant presents the following questions for review in his written brief and argument:

1. Does the mandatory life sentence imposed under section 690.2, The Code, 1973, violate the cruel and unusual punishment proscription of Amendment 8?

2. Did the trial court err in denying defendant's motion for directed verdict where the motion was posited on the contention defendant was not taken before a magistrate for arraignment without undue delay and was not given a preliminary examination to determine if probable cause existed to continue his incarceration?

3. Must a prosecutor withdraw from a case where he may be called as a witness for the defense?

4. Did the trial court err in refusing to admit evidence of an interview conducted after defendant's arrest?

5. Must a court dismiss a case or suppress evidence gathered by the prosecution from the scene of the crime where the defendant charges the prosecution with wrongfully denying him an opportunity to inspect the scene of the crime?

6. Was defendant denied due process of law where preparation of an 1185 page transcript of the proceedings was not completed for ten and one-half months?

■ I. Defendant contends section 690.-2, The Code, 1973, is unconstitutional because its mandatory life sentence is violative of the Amendment 8 proscription against cruel and unusual punishment.

After defendant filed his brief and argument in this matter this court filed its opinion in *State v. Fuhrmann*, 261 N.W.2d 475 (Iowa 1978). In the cited case, 261 N.W.2d at 479, defendant asserted the mandatory sentencing requirements of section 690.2, The Code, were unconstitutional as applied

to her " ' * * * in that the Iowa legislature oversteps its functions and authority in grouping a broad range of acts under one classification and pre-sentencing all persons convicted under the first-degree murder classification to the state's most severe penalty without regard for the specific facts and mitigating circumstances. Such a blind imposition of imprisonment for life at hard labor in the penitentiary is cruel and unusual punishment to all except those whose actions completely entail the highest sanctioned crime.' "

In determining this issue adversely to defendant's claim in the present case this court said at 261 N.W.2d 479–480:

"A state has wide latitude in fixing punishment for crimes. * * * [citing authority]. Our legislature has the power and the responsibility to define crimes and prescribe punishment. * * * [citing authority]. Life imprisonment for first-degree murder is not so disproportionate to the seriousness of the offense as to shock the conscience or sense of justice. * * * [citing authority]."

Our holding in *Fuhrmann* is dispositive of this issue.

We call attention to sections 707.2, 902.1 and 902.2 of the new Criminal Code which became effective January 1, 1978.

■ II. Defendant in seeking to support his contention the trial court erred in denying his motion for directed verdict insists in this court he is entitled to some kind of relief because his constitutional right to a probable cause hearing was denied him. Nevertheless, he concedes the denial of this right does not entitle him to have his conviction vacated.

After the State rested, the defense made a motion for directed verdict in four parts. In its second part the defense stated:

"Secondly, we would ask the Court to direct a verdict of acquittal based upon the failure of the County Attorney's office and the Waterloo Police Department to take the

defendant before a magistrate without undue delay, it being a matter of record he was not arraigned until 4 o'clock on June 7th, having been arrested at about 10:30 p. m. on June 6, 1974."

In support of his position urged in the second question stated for review defendant also maintains in this court he was never taken before a magistrate for a preliminary examination to determine probable cause for his continued detention.

It might well be argued the assertion just quoted from defendant's motion for directed verdict was wholly insufficient to alert the trial court to the contention defendant now urges in this court that his right to a hearing on probable cause was violated.

"A motion for a directed verdict is *one method of testing the legal sufficiency of the evidence.* It is in its nature a demurrer to the evidence." (Emphasis supplied). 75 Am.Jur.2d, Trial, section 469, p. 488. Here this portion of the motion for directed verdict did not test the legal sufficiency of the evidence. Instead, it challenged the right of the State to bring the action. We will consider this part of the motion as a motion to dismiss and will, consequently, consider the issue it raised.

A similar problem was considered by this court in *State v. Lass*, 228 N.W.2d 758, 762–763 (Iowa 1975). We repeat what the court said there:

"*Failure to Hold Preliminary Examination.* Defendant's first contention involves questions of whether, on a county attorney's information without a preliminary examination, an accused may lawfully (1) *be restrained pending trial* and (2) *be convicted upon trial.* This case does not actually present the first question, however, as defendant is not being restrained pending trial; he has been convicted. The United States Supreme Court made this point clear in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54. This case presents the second question: the validity of a conviction on a prosecutor's information without a

preliminary examination. In *Gerstein* the Court also made clear that such a conviction is valid.

"*Gerstein* was a class action brought by prisoners awaiting trial, challenging Florida procedure which permitted authorities to hold and try an accused on a prosecutor's information without a probable cause hearing before a judicial officer. During pendency of the class action the prisoners were convicted on the informations, but the United States Supreme Court nevertheless held that the action was not moot as to unnamed members of the class. The Court unanimously held that a probable cause determination is a condition to any significant pretrial restraint on liberty but that an accused is not entitled to judicial oversight of the decision to prosecute nor is he entitled to have a conviction voided for lack of a probable cause determination. The Court stated:

"In holding that the prosecutor's assessment of probable cause is not sufficient alone to justify restraint on liberty pending trial, we do not imply that the accused is entitled to judicial oversight or review of the decision to prosecute. Instead, we adhere to the Court's prior holding that a judicial hearing is not prerequisite to prosecution by information. * * * [citing authorities]. Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction. * * * [citing authorities]. Thus, as the Court of Appeals noted below, although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause. [*Pugh v. Rainwater*, 5 Cir., 1973] 483 F.2d 778, at 786–787. * * * [citing authorities]." (Emphasis in original).

As there, we find no merit in defendant's contention here. Hence, the trial court did not err in denying defendant's motion for directed verdict.

In connection with the opinion in *Gerstein* attention is called to rule 2.1, Rules of Criminal Procedure, which became effective January 1, 1978.

III. Defendant contends the trial court erred in denying his motion to disqualify the county attorney from prosecuting the case on the ground that he might be called as a witness for the defense. This motion was based on the fact the county attorney participated or, at least, was present at St. Francis Hospital when Lt. Kehoe questioned him on the night of his arrest.

▮ Defendant supports his position by citation to the Iowa Code of Professional Responsibility for Lawyers, Canon 5, Disciplinary Rules 5–101(B) and 5–102. Rule 5–101(B) does not apply here because it involves the acceptance of employment when a lawyer knows or it is obvious he ought to be called as a witness. Here the county attorney was already employed to represent the people. Rule 5–102 also does not apply because it provides for withdrawal by a lawyer when he learns or it is obvious he ought to be called as a witness *on behalf of his client.* Here the defense was the party which might call him as a witness.

▮ In *State v. King*, 256 N.W.2d 1, 15 (Iowa 1977), this court made clear a prosecutor need not withdraw if he is called as a defense witness when it stated:

"Although a prosecutor should withdraw upon finding it necessary to testify on behalf of the State, he has no such duty when called as a defense witness. * * * [citing authorities].

"Defendant's pretrial *Starr*-exclusion motion was based on the proposition the defense might call Mr. Starr to the witness stand. It would appear the motion was premature. As noted above this is a matter resting in trial court's discretion and the exercise thereof is governed by status of the evidence at the time defendant wishes to make his move. * * * [citing author-

ities]. The court below was therefore fully justified in overruling defendant's motion prior to introduction of any testimony."

Defendant's reliance on *Storbeck v. Fridley*, 240 Iowa 879, 38 N.W.2d 163, as support for his position is misplaced. In *Storbeck* the attorney testified for his client.

Defendant's contention the court erred in denying his motion to disqualify the county attorney is without merit.

IV. Defendant contends the trial court erred in refusing to admit evidence of the St. Francis Hospital questioning.

At the close of the State's evidence the county attorney moved the court to order the defense not to attempt to use the prior statement given by defendant. It based its motion on its belief the statement was a self-serving declaration, in violation of the hearsay rule, and was, therefore, inadmissible. The defense countered contending the evidence was admissible under the res gestae exception to the hearsay rule.

The court considered the motion and ruled as follows:

"THE COURT: Let the record show that the Court has considered the cases shown by both sides and has come to a very reluctant conclusion, in all honesty. I am not going to let it go in. It seems to me the argument that can be made it was spontaneous can also be made to the reverse, that while he was going through all the various processes, he had time for meditation, and he had time to think about what he might be going to say at the proper time. I think we get into a situation where from whenever it was he was arrested, 10:30, until, I believe, the statement started at 3, which would be about what, four hours, five hours, somewhere in that area, he also had an opportunity to be interrogated by the psychiatrist, Dr. Della Maddelena, and I just think there is too big a time lapse to fall within any kind of exception under res gestae. So I am not going to let it in."

Defendant then made an offer of proof which by agreement with the court merely

consisted of entering the transcript of the tape recording as a part of the record.

■ Here defendant wished to use his out-of-court declarations to prove the truth of the matter asserted therein; therefore, the statements were clearly hearsay. *State v. Jeffs*, 246 N.W.2d 913, 916 (Iowa 1976). The question then is whether these hearsay statements are admissible as an exception to the hearsay rule.

In *Gibbs v. Wilmeth*, 261 Iowa 1015, 1024–1025, 157 N.W.2d 93, 98–99, this court made the following pertinent remarks about this exception to the hearsay rule:

"The only objection now before us is that this was hearsay and not part of the res gestae. A statement is said to be part of the res gestae when it is a spontaneous exclamation so closely related to the transaction or occurrence in question as reasonably. to appear to be prompted by it. * * [citing authority].

"Various jurisdictions have established different rules by which to test the admissibility of res gestae statements. We have adopted two standards as controlling. They are: (1) spontaneity, and (2) such closeness of connection with the transaction as to exclude any presumption of fabrication. * * * [citing authorities].

"Plaintiff claims the statement here was too far removed in time to meet the requirement of spontaneity and also that it was not prompted by the event itself but was rather elicited by inquiry from Reverend Collier. Both these considerations are important as bearing on the defendant's state of mind. However, whether certain testimony is or is not a part of the res gestae cannot be determined by any hard and fast rule. Each case must be decided on its own facts. * * *

"We have several times held a statement in answer to a question does not necessarily violate the res gestae rule. The important consideration is the spontaneity of the statement, however elicited. * * * [citing authorities]."

■ Both sides agree with the point made in *Gibbs* the fact the statements were made in response to questioning does not rule out their admission as part of the res gestae. They disagree as to the spontaneity and closeness of connection. We must determine if the court abused its discretion in concluding the statements were not admissible under the res gestae exception to the hearsay rule.

The murder occurred between 4:30 and 5:00 p. m. and the interview at which the statements were made occurred some nine to nine and one half hours later at 3:00 a. m. In the interval between these two events defendant had appeared very calm and had been helpful to the police. He had much time in which to deliberate. He had given a false name to the officer who apprehended him after he left the scene of the crime. He had been portrayed by the psychiatrist who interviewed him prior to Lt. Kehoe's interview as well-oriented, coherent and responsible.

Defendant relies on *State ex rel. Harris v. Schmidt*, 69 Wis.2d 668, 230 N.W.2d 890 and *Halsey v. Minnesota-South Carolina Land and Timber Company*, 174 S.C. 97, 177 S.E. 29, 100 A.L.R. 1. Neither case supports his position.

In *Schmidt*, the statements of a young boy made the day after a sexual assault on him by the defendant were admitted into evidence as excited utterances (same as the hearsay exception sometimes called spontaneous exclamations). There, 230 N.W.2d at 899, the court stated:

" * * * We conclude that although the statements were made on the 3rd of November about an incident occurring on the 2nd of November they still meet the requirement in the case of a child of this age—the alleged victim of a sexual assault—as an excited utterance exception to the hearsay rule. * * * *A broad and more liberal interpretation is given to what constitutes an excited utterance when applied to young children especially when the child is alleged to have been the victim of*

*sexual assault.* \* \* \* [citing authorities]." (Emphasis supplied).

In *Halsey* statements made by the agent of a vendor of timberland through whom the sale was made and by an employee of the agent two years after the sale were admitted under the res gestae exception because it was then, two years later, that an alleged shortage in the acreage and amount of timber was brought to their attention by the vendee.

The court determined the statements were admissible under the rule stated in *Snipes v. A.–A. Ry. & Electric Corp.*, 151 S.C. 391, 149 S.E. 111, 112. That rule was as follows:

"It cannot be denied, \* \* \* [citing authority], that where a statement was made by an agent of a corporation, while still about the instant business of the corporation, it would be admissible on the theory that such statement was, although not a part of the res gestae as to the immediate transaction, a part of the res gestae as to the general transaction in its entirety."

It is clear both these cases involve situations concerning rules which are not applicable to the case before us. Defendant's reliance upon these cases is misplaced.

Much has been written about the use of the term *res gestae*, though not all is sympathetic to the continued use of the term. See 6 Wigmore on Evidence, (Chadbourn Rev.), section 1745 and McCormick on Evidence, (Second Ed.), section 288.

The authors of *McCormick* tell us:

"The term *res gestae* seems to have come into common usage in discussions of admissibility of declarations accompanying material acts or situations in the early 1800's. At this time the understanding of what is and what is not hearsay was not well developed and the various exceptions to the hearsay rule were not clearly defined. In this context, the phrase *res gestae* served as a convenient vehicle for escape from the hearsay rule in two primary situations. In the first, it was used to explain the admissi-

bility of declarations that were not hearsay at all. In the second, it was used to justify the admissibility of declarations which today come within the four exceptions discussed in this chapter: (1) declarations of present bodily condition, (2) declarations of present mental states and emotions, (3) excited utterances, and (4) declarations of present sense impressions."

The problem presented by this appeal involves the principle of excited utterances as an exception to the hearsay rule.

In *McCormick*, section 297, it is said: "\* \* \* Formulations of the exception differ, but all agree on two basic requirements. First, there must be some occurrence or event sufficiently startling to render normal reflective thought processes of an observer inoperative. Second, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought. \* \* \*

"The rationale for the exception lies in the special reliability which is regarded as furnished by the excitement suspending the declarant's powers of reflection and fabrication."

The exception is stated in rule 803(2), Uniform Rules of Evidence and Fed.Rules Evid., in this fashion:

"(2) *Excited* utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

The problem is whether the tape recording contained statements of defendant which were the result of reflective thought or whether they were rather a spontaneous reaction to the exciting event. *McCormick* suggests, "probably the most important of the many factors entering into this determination is the time factor. If the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement. But as the time between the event

and the statement increases, so does the reluctance to find the statement an excited utterance."

In our opinion the trial court was correct in excluding the tape recording as evidence.

On appeal defendant argues the statements were admissible as prior consistent statements to rebut a charge of recent fabrication. This ground was not urged at trial and will, consequently, not be considered on appeal.

V. Defendant contends the trial court erred in overruling his motion to dismiss and his motion to suppress evidence collected by the State at the scene of the crime. These motions were based on the fact defense counsel did not have an opportunity to inspect defendant's apartment.

It appears from the record defendant's apartment was sealed off by the police from the time of the discovery of the body, June 6, until June 18 when the apartment was turned over to the manager of the building.

June 17 defense counsel requested a court order granting them access to the apartment for the purpose of independent inspection in preparation of a defense. The court indicated it would grant the order but the county attorney indicated such an order was unnecessary. Defendant insists the county attorney then stated he would arrange with the police to make the premises available for inspection by the defense. The county attorney contends he agreed to authorize inspection and that defendant was to contact the police and arrange for an inspection.

At the hearing on these motions Captain Bemisdarfer of the Waterloo Police Department testified that approximately one week after the murder the county attorney called him and advised him to make the apartment available to the defense if they wished to inspect it. June 18, one week later, Captain Bemisdarfer turned the apartment over to the manager because he

had not heard from the defense. The apartment building manager agreed the apartment had been turned over to him on June 18.

The defense never got the opportunity for an inspection of the apartment. In a professional statement before the trial court the defense maintained it called and left messages for the county attorney several times during the week following June 17 but its calls and messages went unanswered. Finally several days later the defense contacted the manager but the apartment had already been cleaned out, repainted and repaired.

Defendant charges he was denied his constitutional rights and procedural due process because of the chicanery practiced by the county attorney in this matter. He does not contend he was denied access to the evidence gathered at the apartment by the State, but, instead, that because of the violation of constitutional rights the court should have granted his motion to dismiss or at least his motion to suppress.

Defendant relies on *United States v. Bryant*, 439 F.2d 642 (D.C.Cir.1971); *United States v. Pollock*, 417 F.Supp. 1332 (D.Mass. 1976); and *Farrell v. State*, 317 So.2d 142 (Fla.App.1975), as support for his position.

In *Bryant*, 439 F.2d at 645, a government agent had made a tape recording of a drug sale but when the defense attempted to gain access to the tape through discovery, it had been lost. The tape was owned by the government and under its control at all times. The contents of the tape were especially important in the case because without the undercover buyer agent's " * * * account of the motel room conversations, the Government would have had almost no evidence against appellant Bryant and a much weaker case against appellant Turner." The undercover agent was the only person who could testify the two appellants had aided and abetted in the sale of the drugs. Thus, the credibility of his story became the key to conviction.

In *Pollock*, a government agent had taken notes of an interview with an arrested

drug transporter. Several months later the drug transporter was arrested in possession of drugs during a raid on a drug sale. Pollock contended he was an agent of the government. He based this contention on an agreement he had made several months earlier when he had been arrested for transporting drugs.

Pollock contended he and the agent had struck a bargain whereby the agent agreed the government would let him go on the transportation charge if he would agree to set up a buy of several pounds of cocaine. He contended the agent agreed if he was arrested during the sale, the government would come to his aid and protect him from prosecution.

The agent contended he had never made any such bargain and had instead only talked to Pollock about marijuana. He admitted he had made notes of their conversation but he had destroyed them after a report was compiled based on the notes.

It developed this report was actually prepared by the agent's supervisor who contended he based it on the agent's notes. The report contained a discussion of an agreement reached between the agent and Pollock. By the terms of this agreement the agent agreed to protect Pollock from prosecution only if he was arrested without being in possession of drugs.

This report was actually made after the hearing in which Pollock contended he was a government agent. It had been back-dated so it would appear to have been prepared prior to the hearing. It refuted every contention made by defendant at the hearing.

*Farrell* is not applicable here because it involves a situation where the State contended it had no tape recording and by the time the defense discovered the State had actually made a tape recording, the tape was lost.

In *Bryant* the court remanded the case to determine if there had been any bad faith suppression of the tape recording. In *Pollock* the court found the government guilty

of such suppression and the court dismissed the case against the defendant.

The *Pollock* case and the *Bryant* case are based on the reasoning of an earlier case, *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537, where the United States Supreme Court had determined the defendant was entitled to no relief because a tape recording had been destroyed. In these three cases the courts developed certain rules which defendant contends are applicable to the case at hand.

These three cases apply when evidence, which may or may not be exculpatory, is in the possession of the government and when discovery of the evidence is sought by the defense the evidence is or has been destroyed. In each case this evidence was important to the defense because without it a conviction of the defendant would have been based on the credibility of a witness to the event to which the evidence relates or because, if favorable to the defendant, it provided him with a defense to conviction.

In *Bryant* and *Pollock* the prosecution was in control of evidence which the defendants contended was exculpatory. Here it was purely speculative whether there was any other helpful evidence, exculpatory or otherwise, in the apartment.

Here the State shared with defendant all the evidence which it gathered at the scene of the crime. The defense does not suggest the prosecution had in its possession other evidence which may be exculpatory. It contends instead the prosecution employed chicanery to keep the defense from inspecting the scene of the crime. We do not find any evidence of chicanery.

The fact the county attorney told Captain Bemisdarfer to allow the defense access to the apartment negates even the implication chicanery was employed here. The loss of other evidence, if any, was attributable not to intentional or willful destruction or to negligent destruction but rather to a misunderstanding between the prosecution and the defense.

Police departments of this state would be well advised that in the future they contact

the chief prosecuting officer prior to releasing premises constituting the scene of any crime.

As noted the State shared this evidence with defendant. He had ample time to study it and to employ his own experts to test it and to rebut the findings of the State's expert witnesses. The court did not err in denying the motion to suppress the evidence the State gathered at the scene of the crime.

VI. Defendant contends he was denied due process because the transcript of the proceedings below was not finished until 14 months after his trial. Actually because of a motion for new trial made by defendant, he did not request the transcript until February 28, one day after he filed his notice of appeal. It was completed January 15, 1976, ten and one half months later. Neither side presents any facts as to the reason for the delay and the record discloses none.

This transcript when typed was almost 1200 pages in length. The court reporter here was employed by the court and was responsible for the performance of other duties. We do not condone the delay. However, in view of the record furnished us we are unable to fix responsibility therefor. In our opinion the delay did not deny defendant due process as he contends.

The case is—Affirmed.