STATE of Wisconsin EX REL. Willie C. SIMPSON,
Petitioner-Appellant,†

v.

David H. SCHWARZ, Administrator, Division of
Hearings and Appeals, Respondent-Respondent.

Court of Appeals

*No. 01–0008. Submitted on briefs September 12, 2001.—Decided
December 20, 2001.*

2002 WI App 7

(Also reported in 640 N.W.2d 527.)

† Petition to review denied 3-19-02.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Willie C. Simpson*, pro se.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Kathleen M. Ptacek*, assistant attorney general.

Before Dykman, Deininger and Lundsten, JJ.

¶ 1. DYKMAN, J. Willie Simpson appeals from an order affirming a decision of the Division of Hearings and Appeals (DHA) to revoke Simpson's probation. DHA made its decision after finding that Simpson had violated conditions of his probation by having sexual contact with LeAnn H., a six-year-old girl. Simpson argues that his right to due process was violated because, at his revocation hearing, the administrative law judge failed to make a specific finding of good cause for not allowing him to cross-examine LeAnn, as required by *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973). He also contends that DHA erred when it concluded that he was not entitled to sentence credit for the time he spent on electronic monitoring.

¶ 2. We agree with Simpson that the ALJ erred in failing to make a good cause finding. However, we conclude the error was harmless because good cause

exists, its basis is found in the record, and its finding is implicit in the ALJ's ruling. Further, Simpson is not entitled to sentence credit for the time he spent on electronic monitoring because he was not then in "custody" within the meaning of WIS. STAT. § 973.155 (1997–98).[1] We therefore affirm.

### Background

¶ 3. A jury convicted Willie Simpson of second-degree sexual assault of a child in 1997. The circuit court imposed and stayed a fifteen-year prison sentence and placed Simpson on probation for five years. As a condition of probation, the court required Simpson to serve one year at the House of Corrections, with four months to be served at the House of Corrections and the remainder on electronic monitoring. While on probation, Simpson was prohibited from, among other things, violating any state or federal statutes, and having any contact with minors without prior approval of his agent.

¶ 4. On September 21, 1999, police arrested Simpson and the State charged him with sexual assault of a child. Soon after, the Department of Corrections recommended that Simpson's probation be revoked. DOC alleged that Simpson had sexual contact with LeAnn H., whose birth date is July 12, 1993, from January 1998 to September 1999.

¶ 5. At the revocation hearing, LeAnn's mother, Tracy H., testified that Simpson and his wife, Francesca, had provided childcare for LeAnn on occasion while Tracy was working. According to Tracy, LeAnn would stay at the Simpsons while they were

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

watching LeAnn. One day after being picked up from school by Tracy, LeAnn complained to her mother that the janitor at school was teasing her. Tracy told LeAnn, "If anyone ever messes with you, you have to tell mama." In response, LeAnn told her mother: "I'm sorry. I've been keeping a secret from you." When Tracy asked her what the secret was, LeAnn told her that Simpson had "messed with her." LeAnn further explained that, when she spent the night at the Simpsons, Simpson would take off her underwear and "rub[] his stuff on her stuff."

¶ 6. Police officer Cheryl Lehnert also testified. Officer Lehnert works in a specialized unit dealing with sexual assaults. She interviewed LeAnn after Tracy called the police on September 21, 1999. In her police report, Lehnert wrote that she asked LeAnn "if anyone had ever touched her private parts." LeAnn stated that "Will" had touched her, and that he had done it when she "spent the night over there," both when she was five and six years old. LeAnn told Lehnert that "Will" would wake her up while she was sleeping, take off her underwear, and "put his 'private parts' against her 'private parts' and would start humping her."

¶ 7. In her testimony, Lehnert stated that she confirmed that "Will" meant Willie Simpson by asking LeAnn to identify, while driving in the car, where "Will" lived, and that LeAnn correctly pointed to Simpson's home without any coaching. Lehnert also testified that she had interviewed LeAnn alone, outside the presence of Tracy.

¶ 8. Finally, Francesca Simpson testified that LeAnn had spent the night at her and Simpson's home on three occasions. Francesca spoke to both Tracy and LeAnn the night Tracy reported the assault to the police. Francesca testified that Tracy told her on the

phone that she believed "somebody [is] messin' with my daughter, but I don't think it was Will [Simpson]." Francesca also testified that LeAnn told her that Simpson had "touched" her on two occasions, one night when the power went out and while Francesca was in the shower, and again when LeAnn and Simpson's daughter were sleeping in a tent made out of blankets. When Francesca asked LeAnn, "Did anybody make you say this?" Francesca testified that LeAnn took a long pause and then responded, "What, Mommy, what?" Neither LeAnn nor Simpson testified at the hearing.

¶ 9. In a written decision, the ALJ found that Simpson violated his probation by having sexual contact with LeAnn. The ALJ based this finding on Tracy's testimony. The ALJ found "the disclosures by L[eAnn] H. to her mother, Tracy H[.], to be reliable." The ALJ then concluded that there were no appropriate alternatives to revocation. He granted Simpson sentence credit for the time he spent at the House of Corrections, but did not grant him sentence credit for August 30, 1997, to February 28, 1998, the time he spent on electronic monitoring. The administrator for DHA sustained the ALJ's decision, concluding that LeAnn's out-of-court statements bore "sufficient indicia of reliability to establish by a preponderance of the evidence that Mr. Simpson sexually assaulted her in violation of his probation rules." Further, DHA concluded that Simpson was not entitled to sentence credit from August 30, 1997, to February 28, 1998, because "electronic monitoring is not 'custody' within the meaning of WIS. STAT. § 973.155." Simpson filed a petition for a writ of certiorari with the Milwaukee County Circuit Court, and the circuit court affirmed DHA's decision. Simpson appeals.

221

## Opinion

### A. Standard of Review

¶ 10. In a review of a decision to revoke probation, we defer to the decision of the Division of Hearings and Appeals, applying the same standard as the circuit court. *See State ex rel. Washington v. Schwarz*, 2000 WI App 235, ¶ 16, 239 Wis. 2d 443, 620 N.W.2d 414; *Von Arx v. Schwarz*, 185 Wis. 2d 645, 655, 517 N.W.2d 540 (Ct. App. 1994). Our review is limited to the following questions: (1) whether DHA kept within its jurisdiction; (2) whether DHA acted according to law; (3) whether DHA's actions were arbitrary, oppressive or unreasonable and represented its will rather than its judgment; (4) and whether the evidence was such that DHA might reasonably make the decision in question. *Von Arx*, 185 Wis. 2d at 655.

### B. Right to Confront LeAnn H.

¶ 11. Simpson does not argue that there was insufficient evidence for DHA to reasonably conclude that he violated the conditions of his probation. Rather, Simpson asserts that DHA failed to act according to law. He contends that his right to due process was violated when the ALJ permitted Tracy and Lehnert to testify regarding what LeAnn had told them because he was then prevented from exercising his right to confront an adverse witness. For support, Simpson points to *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973).

¶ 12. In *Morrissey*, a parolee had his parole revoked without a revocation hearing. 408 U.S. at 472–73. The Court noted the now oft-repeated principle that

222

parolees are not entitled to the "full panoply of rights" due to criminal defendants. *Id.* at 480; *see also State ex rel. Struzik v. DHSS*, 77 Wis. 2d 216, 220, 252 N.W.2d 660 (1977). However, because parole revocation involves a loss of liberty and inflicts a "grievous loss" on the parolee, the Due Process Clause in the Fourteenth Amendment demands that parolees have an opportunity to be heard before the decision to revoke parole is made. *Morrissey*, 408 U.S. at 482, 487. Moreover, the Court concluded that among the "minimum requirements of due process," is "the right to confront and cross-examine adverse witnesses (unless the hearing examiner specifically finds good cause for not allowing confrontation)." *Id.* at 489.[2] The Court emphasized that it had "no thought to create an inflexible structure for parole revocation procedures," and that the "process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversarial trial." *Id.* at 489–90.

¶ 13. The following year, *Gagnon* held that the due process requirements enunciated in *Morrissey* regarding parole revocations are equally applicable to probation revocations. *See id.* at 786; *see also State v. Hardwick*, 144 Wis. 2d 54, 58, 422 N.W.2d 922 (Ct. App. 1988). The holdings from *Morrissey* and *Gagnon* were reaffirmed in *Black v. Romano*, 471 U.S. 606, 612 (1985).

¶ 14. Although the ALJ found LeAnn's out-of-court statements to be reliable, the ALJ did not make a

---

[2] The Confrontation Clauses in both the Sixth Amendment and article I, section 7, are not directly implicated because those provisions apply only to criminal prosecutions, while probation revocation hearings are civil proceedings. *See State ex rel. Vanderbeke v. Endicott*, 210 Wis. 2d 502, 513, 563 N.W.2d 883 (1997).

specific finding regarding whether there was "good cause" under *Morrissey* and *Gagnon* for failing to require LeAnn to testify. DHA also concluded that LeAnn's statements were reliable. Simpson argues that his due process rights were violated and that the decision to revoke his probation must be reversed. In response, the State argues that the ALJ was not required to make a finding of good cause because the hearsay evidence was reliable. We are thus confronted with two questions. First, does an ALJ's failure to make a specific finding regarding good cause require automatic reversal? Second, if automatic reversal is not required, was the good cause requirement otherwise met in this case?

¶ 15. With regard to the first question, neither the U.S. nor the Wisconsin Supreme Court has provided any direct guidance regarding the consequences of an ALJ's failure to make a specific finding of good cause. The State relies on *Egerstaffer v. Israel*, 726 F.2d 1231 (7th Cir. 1984), for the proposition that the need to make a finding of good cause "vanishes" "if the proffered evidence itself bears substantial guarantees of trustworthiness." *Id.* at 1234. We cannot agree, however, that the requirement of finding good cause *ever* simply "vanishes." *Morrissey*, *Gagnon*, and *Black* hold unequivocally that hearing examiners must specifically find that good cause exists for not allowing confrontation of adverse witnesses. The Court made no exception for making this finding when evidence is reliable. Therefore, regardless whether the reliability of evidence *can be a basis for* a finding of good cause (which we will discuss further below), an ALJ may not avoid making such a finding whenever he or she determines

that the evidence is reliable. We therefore agree with Simpson that the ALJ erred by failing to comply with *Morrissey*.

¶ 16. We do not agree, however, that this error requires automatic reversal. Constitutional error is generally subject to a harmless error analysis. *State v. Howard*, 211 Wis. 2d 269, 293, 564 N.W.2d 753 (1997). Such error is harmless if the court is "able to declare a belief that it was harmless beyond a reasonable doubt," i.e., that there is no "reasonable possibility" that the error might have contributed to the outcome of the proceeding. *Chapman v. California*, 386 U.S. 18, 23–24 (1967); *see also State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985). Consistent with a harmless error analysis, we conclude that the failure to make a specific finding of good cause is harmless where good cause exists, its basis is found in the record, and its finding is implicit in the ALJ's ruling. *See United States v. Grandlund*, 71 F.3d 507, 510 (5th Cir. 1995); *see also United States v. Walker*, 117 F.3d 417, 420 (9th Cir. 1997) (applying harmless error test to trial court's failure to make good cause finding).[3] Although a failure to find

---

[3] We acknowledge that some courts have determined that a failure to specifically find good cause *does* require automatic reversal. *See, e.g., State v. Alderman*, 590 N.E.2d 836, 838 (Ohio Ct. App. 1990); *Commonwealth v. Davis*, 336 A.2d 616, 624 (Pa. Super. 1975); *State v. Austin*, 685 A.2d 1076, 1081 n.2 (Vt. 1996). None of these cases, however, explains why a harmless error analysis would be inapplicable to determinations regarding the right to confront an adverse witness in a revocation hearing, even though the Supreme Court has repeatedly held it does apply to Confrontation Clause cases. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Because a probationer's right to confront witnesses is subject to more restrictions than a

good cause does not require automatic reversal, we encourage ALJs to make such a finding, and state their reasons for doing so. This better ensures that both due process is given and that good cause will be determined on appeal.

¶ 17. We turn next to the question whether the present facts satisfy this test. Although Simpson emphasizes that the ALJ's failure to find good cause constitutes grounds for automatic reversal, he also argues that no basis for finding good cause exists because there were alternatives to relying on hearsay, such as use of videotaped testimony, and because the proffered evidence was unreliable. The State contends that there was good cause because LeAnn's out-of-court statements were reliable.

¶ 18. State and federal courts have not been consistent in their descriptions of "good cause." Many appellate courts engage in a balancing test, in which the probationer's need for confrontation is weighed against the government's interest in denying confrontation. *E.g., Barnes v. Johnson,* 184 F.3d 451, 454 (5th Cir. 1999); *United States v. Martin,* 984 F.2d 308, 312 (9th Cir. 1993); *United States v. Bell,* 785 F.2d 640, 642–43 (8th Cir. 1986); *State v. Yura,* 825 P.2d 523, 530 (Kan.1992). In applying this test, courts consider a number of factors, including the difficulty or expense in obtaining live witnesses, the danger that live testimony could impose on the witness, the importance of the evidence in the decision to revoke, and the reliability of the evidence the government offers in place of live testimony.

---

criminal defendant's similar right, we are not persuaded that a stricter standard should be used in revocation hearings than in criminal trials.

¶ 19. However, courts considering these factors are not always clear or in agreement regarding whether the government must show both that there are barriers to obtaining a live witness *and* that the proffered evidence is reliable, or if a strong showing regarding reliability is sufficient. *Compare United States v. Zentgraf*, 20 F.3d 906, 910 (8th Cir. 1994) (holding that reliability of evidence does not satisfy good cause requirement if the government fails to provide an explanation for not producing a witness); *State v. Dahl*, 990 P.2d 396, 401 (Wash. 1999) ("[T]he reliability of the hearsay must be considered in light of the difficulty in procuring live witnesses.") *with Walker*, 117 F.3d at 420 (concluding that failure to conduct balancing test is harmless where evidence was reliable).

▬

¶ 20. We agree with those courts concluding that a finding of good cause should generally be based upon a balancing of the need of the probationer in cross-examining the witness and the interest of the State in denying confrontation, including consideration of the reliability of the evidence and the difficulty, expense, or other barriers to obtaining live testimony. Because "[c]ross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested," *see Davis v. Alaska*, 415 U.S. 308, 316 (1974), the State should provide a reason for why it will not make a witness available for cross-examination. This conclusion is supported by *State ex rel. Harris v. Schmidt*, 69 Wis. 2d 668, 683–84, 230 N.W.2d 890 (1975), in which the court upheld a hearing examiner's finding of good cause after both concluding that the hearsay evidence met the excited utterance exception under WIS. STAT. § 908.03 *and* that it was reasonable not to produce the witness because of the nature of the

charge (sexual assault) and the age of the alleged victim (five years old).[4] Further, the Court in *Gagnon* specifically alluded to "the difficulty and expense of procuring witnesses" as a factor to consider with respect to a probationer's right to confront adverse witnesses. 411 U.S. at 782 n.5.

¶ 21. However, a rule requiring reversal of a revocation decision in each instance that the record fails to show that obtaining live testimony would have been difficult for the State would create a standard in revocation hearings that is stricter than in criminal trials. Even the right to confront adverse witnesses in a criminal prosecution is not absolute. In that context, it is not always necessary that a witness be declared unavailable before his or her out-of-court declarations may be admitted into evidence if the proffered hearsay "has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule," *White v. Illinois*, 502 U.S. 346, 356–57 (1992). A focus on reliability, therefore, comports with the central purpose of confrontation, namely, "to ensure the reliability of the

---

[4] *State ex rel. Harris v. Schmidt*, 69 Wis. 2d 668, 682, 230 N.W.2d 890 (1975), is the only Wisconsin case applying the *Morrissey - Gagnon* good cause requirement. Although the *Harris* court agreed with the hearing examiner that good cause existed based on reliability and the difficulty inherent in cross-examining child victims of sexual assault, it did not explain whether this was a minimum requirement or otherwise provide a framework for applying the test in future cases. Further, while we acknowledge the factual similarity between *Harris* and the present case, *Harris* is not controlling as there is no basis in the record from which we could infer that the ALJ determined that LeAnn was unable to testify or even considered her age in deciding that confrontation would be denied.

evidence." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Consequently, the more reliable the proffered evidence is, the less necessary it would be for the State to show that obtaining a witness's live testimony would be difficult.

¶ 22. We need not determine, however, the contours of the good cause requirement, because we conclude that the test is always met when the evidence offered in lieu of an adverse witness's live testimony would be admissible under the Wisconsin Rules of Evidence.[5] *Cf. State ex rel. Prellwitz v. Schmidt*, 73 Wis. 2d 35, 39, 242 N.W.2d 227 (1976) (holding that there was no "constitutional barrier" to considering DOC records in probation revocation hearings because they fell within the public records hearsay exception under Wis. Stat. § 908.03(8)). Further, because the testimony proffered by the State in this case would have been admissible under the Wisconsin Rules of Evidence, we conclude that the *Morrissey - Gagnon* good cause requirement was satisfied.

---

[5] We recognize that a hearsay statement that satisfies the requirements of the Wisconsin Rules of Evidence may not be sufficiently reliable to satisfy the requirements of the Confrontation Clause. *See State v. Oliver*, 161 Wis. 2d 140, 145, 467 N.W.2d 211 (Ct. App. 1991). However, the Rules of Evidence and the Confrontation Clause "protect similar values." *Idaho v. Wright*, 497 U.S. 805, 814 (1990). Of course, neither the Rules nor the Sixth Amendment apply at revocation hearings and an ALJ's failure to comply with either of them will not necessarily be error. We only conclude that an ALJ's observance of the Wisconsin Rules of Evidence is sufficient to satisfy the good cause requirement under *Morrissey* and *Gagnon*.

¶ 23. *State v. Sorenson*, 143 Wis. 2d 226, 421 N.W.2d 77 (1988), set out the requirements for admitting into evidence the hearsay statement of child sexual assault victims under the residual exception to the hearsay rules. In *Sorenson*, the supreme court held that, because there is "a compelling need for admission of hearsay arising from young sexual assault victims' inability or refusal to verbally express themselves in court . . ., use of the residual [hearsay] exception [under WIS. STAT. § 908.03(24)] is an appropriate method to admit these statements if they are otherwise proven sufficiently trustworthy." *Id.* at 243. Under the residual exception, hearsay evidence may be admitted at trial if it possesses " 'circumstantial guarantees of trustworthiness' comparable to those existing for enumerated exceptions." *Id.* Further, the residual exception may be used whether or not the child is available to testify. *See id.* at 242; *State v. Oliver*, 161 Wis. 2d 140, 143, 467 N.W.2d 211 (Ct. App. 1991). The supreme court enumerated a non-exclusive set of factors that courts may consider in assessing whether a child's statements are admissible. The weight accorded each factor may vary and no single factor is dispositive. *Sorenson*, 143 Wis. 2d at 246.

> First, the attributes of the child making the statement should be examined, including age, ability to communicate verbally, to comprehend the statements or questions of others, to know the difference between truth and falsehood, and any fear of punishment, retribution or other personal interest, such as close familial relationship with the defendant, expressed by the child which might affect the child's method of articulation or motivation to tell the truth.

*Id.* at 245.

¶ 24. With regard to this factor, we note that LeAnn was six years old when she made the statements to Tracy and Lehnert. At that age, LeAnn was "unlikely to review an incident of sexual assault and calculate the effect of a statement about it," thus suggesting she was telling the truth. *Id.* at 246 (citing *State v. Padilla*, 110 Wis. 2d 414, 422, 329 N.W.2d 263 (Ct. App. 1982)). Further, Lehnert testified that LeAnn was "very bright" and "gave good answers" to the preliminary questions Lehnert asked her to establish LeAnn's level of development. According to the police report, she was able to count from one to twenty and recite her ABC's. She was also able to identify male and female anatomy, referring to both a vagina and a penis as "private part." Finally, there is no indication in the record that LeAnn did not know the difference between falsity and truth. She stated to Lehnert that "to tell the truth means you don't lie."

> Second, the court should examine the person to whom the statement was made, focusing on the person's relationship to the child, whether that relationship might have an impact upon the statement's trustworthiness, and any motivation of the recipient of the statement to fabricate or distort its contents.

*Id.* at 245.

¶ 25. LeAnn told both her mother and Officer Lehnert that Simpson had sexually assaulted her. In neither case was LeAnn prompted to specifically identify Simpson, yet she did in both conversations. Because "it would be natural for a child who has been physically abused by another to inform a parent of that abuse," the fact that LeAnn first told her mother provides the statements with a circumstantial guarantee of trustworthiness. *State v. Oliver*, 161 Wis. 2d 140, 467 N.W.2d 211 (Ct. App. 1991). Although Francesca's testimony suggested that Tracy had told LeAnn to fabricate an

abuse allegation, Simpson has offered no apparent motive for why Tracy would seek to coerce her daughter into making a false accusation, or for Tracy to distort LeAnn's statements. Further, even if Tracy had an incentive to lie, there is no indication that Officer Lehnert would have the same incentive. LeAnn spoke to Lehnert alone, so LeAnn could not have been coached by Tracy during the interview. But LeAnn repeated, in even greater detail, what she had told her mother. This further suggests the veracity of LeAnn's statements.

> Third, the court should review the circumstances under which the statement was made, including relation to the time of the alleged assault, the availability of a person in whom the child might confide, and other contextual factors which might enhance or detract from the statement's trustworthiness.

*Sorenson*, 143 Wis. 2d at 245–46.

¶ 26. LeAnn did not relate the alleged assaults to her mother immediately after they took place. However, "[c]ontemporaneity and spontaneity of statements are not as crucial in admitting the hearsay statement of young sexual assault victims under the residual exception." *Id.* at 249. Further, LeAnn explained that she waited to tell her mother because Simpson told her to keep it secret. LeAnn related the incident to her mother immediately after Tracy told LeAnn, "If anyone ever messes with you, you have to tell mama."

> Fourth, the content of the statement itself should be examined, particularly noting any sign of deceit or falsity and whether the statement reveals a knowledge of matters not ordinarily attributable to a child of similar age.

*Id.* at 246.

¶ 27. There is nothing in the content of LeAnn's statements showing any signs of falsity. Simpson claims that LeAnn made inconsistent statements, and that when she "was asked if Mr. Simpson had molested her 'SPECIFICALLY' she denied it." It is true that in March 1999 Tracy had asked LeAnn, "Has Will ever messed with you?" and LeAnn denied it. But again, this is not surprising when LeAnn had later stated that Simpson had told her not to tell anyone about the incidents.

¶ 28. LeAnn "volunteered sufficiently graphic accounts of sexual contact to suggest the source of her knowledge was within the realm of her experience." *State v. Jagielski*, 161 Wis. 2d 67, 75, 467 N.W.2d 196 (Ct. App. 1991). Although Tracy testified only that LeAnn told her that Simpson had "rubbed his stuff on her stuff," LeAnn was more detailed with Lehnert. She told Lehnert: "Will" would wake her up while she was sleeping, push her nightgown up, take off her underwear and "put his 'private parts' against her 'private parts' and would start humping her. LeAnn described humping as push ups, stating you go up and down." LeAnn even noted that Simpson once put her underwear back on backwards so she had to take them off and put them back on right before she went back to sleep.

> Finally, other corroborating evidence, such as physical evidence of assault, statements made to others, and opportunity or motive of the defendant, should be examined for consistency with the assertions made in the statement.

*Sorenson*, 143 Wis. 2d at 246.

¶ 29. Simpson emphasizes repeatedly that a doctor's examination of LeAnn had shown no sign of a sexual assault. Based on LeAnn's description of events, however, there is no reason that there would be physical

evidence, since LeAnn stated that he had taken off her underwear and "rubbed" his "private parts" on her "private parts;" LeAnn's statements do not indicate that there was any penetration. Simpson also argues that LeAnn's testimony is unreliable because it contained "substantial inconsistencies." However, the only inconsistencies that Simpson refers to are those between LeAnn's statements to Francesca and LeAnn's statements to Tracy and Lehnert regarding exactly *when* the assaults occurred. For example, Francesca testified that LeAnn told her that Simpson had not touched her the night the electricity went out, but according to Lehnert, LeAnn stated that this was one of the times. We do not consider this disparity in accounts to be determinative. LeAnn's statements to both Tracy and Lehnert were almost completely consistent, and even Francesca agreed that LeAnn stated to her that Simpson had "touched" her twice.

¶ 30. Considering the factors as a whole, we conclude that LeAnn's statements possess sufficient circumstantial guarantees of trustworthiness to qualify under the residual hearsay exception. We therefore further conclude that good cause existed and its basis is found in the record, and because the ALJ found specifically that the evidence was reliable, a finding of good cause was implicit in the ALJ's ruling. Accordingly, the ALJ's failure to specifically find good cause was harmless error.[6]

---

[6] Simpson does not challenge the sufficiency of the evidence, but we also note that DHA could reasonably conclude that DOC had shown by a preponderance of the evidence that Simpson violated the conditions of his probation. Although its decision was based entirely on hearsay, this is sufficient to prove

## C. Sentence Credit

¶ 31. WISCONSIN STAT. § 973.155(1)(a) provides: "A convicted offender shall be given credit toward the service of his or her sentence for all days spent in custody in connection with the course of conduct for which sentence was imposed." Simpson argues that DHA erroneously interpreted § 973.155 when it concluded that he was not entitled to sentence credit for the time he spent under electronic monitoring. Statutory interpretation is a question of law that we review de novo. *State ex rel. Saffold v. Schwarz,* 2001 WI App 56, ¶ 5, 241 Wis. 2d 253, 625 N.W.2d 333.

¶ 32. WISCONSIN STAT. § 973.155(1)(a) does not define the term "custody." Although WIS. STAT. § 973.10(1) provides that "[i]mposition of probation shall have the effect of placing the defendant in the custody of the department," the supreme court has not considered § 973.10(1) controlling for sentence credit purposes. Rather, in *State v. Magnuson,* 2000 WI 19, ¶ 25, 233 Wis. 2d 40, 606 N.W.2d 536, the supreme court held that "for sentence credit purposes an offender's status constitutes custody whenever the offender is subject to an escape charge for leaving that status." In determining whether an individual would have been subject to an escape charge, we look both to the general escape statute, WIS. STAT. § 946.42, as well as "other statutory

a probation violation so long as the hearsay is reliable. *See State ex rel. Thompson v. Riveland,* 109 Wis. 2d 580, 583, 326 N.W.2d 768 (1982). *But see Colina v. State,* 629 So.2d 274, 275 (Fla. Dist. App. 1993) (holding that probation violation cannot be proven by hearsay evidence alone); *Stanley v. State,* 587 So.2d 1258, 1259 (Ala. Crim. App. 1991) (same); *State v. Carey,* 620 A.2d 201, 205 (Conn. Ct. App. 1993), *rev'd on other grounds,* 636 A.2d 840 (Conn. 1994) (same).

provisions in which the legislature has classified certain situations as restrictive and custodial by attaching escape charges for an unauthorized departure from those situations." *Id.* at ¶ 26.

¶ 33. Turning first to WIS. STAT. § 946.42, we note that a probationer cannot be charged with escape under that statute unless he or she is in "actual custody or is subject to a confinement order under [WIS. STAT.] s. 973.09(4)." *See* WIS. STAT. § 946.42(1)-(2). The statute further defines "actual custody" as including "a secured correctional facility," "a secured child caring institution," "a secure detention facility," "a Type 2 child caring institution," or "a juvenile portion of a county jail, or of a peace officer or institution guard." Section 946.42(1)(a). None of these situations applies to Simpson. Furthermore, "confinement" under WIS. STAT. § 973.09(4) does not include monitored home detention. *State v. Eastman*, 220 Wis. 2d 330, 337–38, 582 N.W.2d 749 (Ct. App. 1998).

¶ 34. Simpson refers us to WIS. STAT. § 302.425, regarding home detention programs. Under § 302.425(6), any "prisoner" who intentionally fails "to remain within the limits of his or her detention or to return to his or her place of detention" may be charged with escape. This section only applies, however, to "prisoners" who have been placed in a home detention program by the DOC, a sheriff, or a superintendent. WIS. STAT. § 302.425(2)-(2g). Because Simpson was placed on electronic monitoring by the circuit court, he would not be subject to an escape charge under § 302.425(6). *See Magnuson*, 2000 WI 19, at ¶ 38 (holding that § 302.425 does not apply unless a defendant was placed in home detention by a sheriff, a superintendent, or DOC). Similarly, Simpson could not have been charged with escape from community resi-

dential confinement under .Wis. Stat. § 301.046(6) because Simpson was not placed on electronic monitoring by DOC. Wis. Stat. § 301.046(3); *Magnuson*, 2000 WI 19 at ¶ 33.

¶ 35. Although there are a number of other statutory provisions providing for escape charges, none of them applies here. *See* Wis. Stat. § 301.048(5) (escape from intensive sanctions program); Wis. Stat. § 303.065(2) (escape from work release program); Wis. Stat. § 303.10(5) (escape from county work camp); Wis. Stat. § 938.533(3m) (escape from juvenile placement under corrective sanctions program); Wis. Stat. § 938.538(4)(a) (escape from serious juvenile offender program); Wis. Stat. § 938.539(4) (escape from Type 2 secured correctional facility). Therefore, DHA correctly concluded that Simpson was not entitled to sentence credit for the time he spent on electronic monitoring.

*By the Court.*—Order affirmed.